THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN JACKSON, Defendant-Appellant.

Fourth District   No. 17295

Opinion filed April 15, 1982.—Rehearing denied April 30, 1982.

Daniel D. Yuhas and David Bergschneider, both of State Appellate Defender's Office, of Springfield, for appellant.

C. David Vogel, State's Attorney, of Pontiac (Robert J. Biderman, of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE LONDRIGAN delivered the opinion of the court:

Defendant was charged by indictment with two counts of aggravated battery. He was found guilty by a jury and sentenced to a term of 7½ years' imprisonment, the sentence to be served consecutively to his current 3-year sentences.

At trial, Ronald Salisbury testified that he was an employee of the Pontiac Correctional Center on December 11, 1980, assigned to the gymnasium. Salisbury had received a call earlier in the afternoon ordering him to "shake down" all inmates entering and leaving the gymnasium. About 2:30 p.m. Salisbury was involved in a confrontation with an inmate, Joe Lofton, who refused to be searched. Salisbury wrote a disciplinary "ticket" against Lofton and sent him to the cellhouse.

At 3:30 p.m., Salisbury blew his whistle to indicate to the inmates that it was time to leave the gymnasium. Salisbury blew his whistle first in the gymnasium area and then walked to the weight room and shouted for the inmates to leave. As Salisbury walked out of the weight room, he was struck in the back of the head by a metal object, later determined to be a barbell collar. Salisbury did not see who threw the collar. There were approximately 60 to 70 people in the gym and about 17 to 20 people in the weight room. Salisbury was taken to the hospital and received eight stitches to his head.

Donald Polizzi, a penitentiary investigator, testified that he went to the gymnasium shortly after the attack on Salisbury. The officers had locked the doors to prevent anyone from leaving. Polizzi and the other officers interviewed 59 inmates who were in the gymnasium area.

Polizzi testified that Joe Lofton's nickname was "China Joe" and that Lofton was a lieutenant in the Vice Lords, a prison gang. The other large gang at Pontiac is the Disciples. Over objection, Polizzi testified that defendant was a "soldier" in the Vice Lords. Polizzi said that it was not uncommon for a gang officer to order a soldier to do something. The punishment for refusal to obey an order varies according to each gang, but could include physical harm to the inmate or harm to the inmate's family caused by gang members outside the prison.

Eddie Taylor had been held at Pontiac between April or May of 1979 and December 1980. Taylor testified that he had been a member of a gang, the Black Gangsters Lynchmen, before his incarceration at Pontiac.

On December 11, 1980, Taylor was lifting weights in the weight room. He saw defendant throw a barbell collar at a correctional officer, striking the officer in the back of the head. Defendant jumped back inside the weight room and fled upstairs to the ping-pong room. Taylor told

Polizzi that he would testify against the defendant. Two months later, Taylor was placed on work release. Taylor later violated his work release and had been confined to Joliet.

Taylor testified that the Disciples' insignia was a fork and a six-pointed star, with some members wearing crossed pitchforks as an insignia. At the request of defendant's counsel, Taylor revealed a tattoo of two crossed pitchforks on his interior right forearm. However, Taylor stated that his gang and the Disciples were "associated" and had very similar insignia. According to Taylor, the Vice Lords' insignia was a "VL" with a five-pointed star and moon.

Kevin Scott testified that he and defendant were playing basketball in the gymnasium on December 11, 1980. Scott stated that they had played basketball from the time defendant came to the gym until they were taken out after Salisbury was struck. In response to a prosecution question, Scott said that he had never been a gang member, either in or out of prison.

Defendant testified that on December 11, 1980, he began playing basketball as soon as he got to the gymnasium and quit when the officers came in after Salisbury was injured. He did not throw anything at Salisbury. Defendant did not know "China Joe" and had never talked to Lofton.

In rebuttal, the State called Desi Martin. Martin was an inmate at Pontiac, serving time for deviate sexual assault and armed robbery. Martin was in the weight room when Salisbury was struck. Martin testified that defendant was not in the weight room when Salisbury was struck. Defendant had been in the weight room earlier, Martin testified, but Martin had not seen him holding a barbell collar.

Outside the presence of the jury, the State's Attorney stated that he had been surprised by the testimony and had been told that Martin had seen defendant holding a weight collar 10 minutes before the attack on Salisbury. Over defendant's objection, the State called Martin as a hostile witness.

Martin stuck to his story and denied that he had told the prosecutor and Lieutenant Polizzi that he had seen defendant holding the collar 10 minutes before the attack on Salisbury.

Assistant State's Attorney Charles Frank, who was prosecuting the case, called himself as a witness and was questioned by another assistant State's Attorney. Frank testified that, on two prior occasions, Martin had stated that he had seen defendant with a barbell collar in his hand. Defendant's counsel asked the court to either strike Frank's testimony or limit its application. The court agreed to limit the effect of the testimony.

The jury retired for deliberations at 11:23 a.m. At 6:15 p.m., the judge announced that the jury indicated it was having difficulty. The *Prim*

instruction (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601) was given at 8 p.m. When the jury was still deadlocked at 10:30 p.m., the prosecution and defendant were both agreeable to either a mistrial or sending the jury home for the night. The trial court allowed the jury to return home and resume its deliberations the next morning.

The jury reached a verdict at 9:55 a.m. the following morning. Defendant was convicted on both counts.

Defendant contends that (1) he was not proved guilty beyond a reasonable doubt; (2) the trial court erred in admitting evidence of defendant's gang membership; (3) the trial court erred in allowing Desi Martin to be called as a hostile witness; (4) he was denied a fair trial because the prosecution questioned a defense witness about alleged gang membership without establishing a basis for the questions; and (5) the trial court erred in allowing the jury to go home after the case had been submitted and return the next day and resume deliberations.

Defendant argues that his guilt was not proved beyond a reasonable doubt because the credibility of the State's chief witness, Eddie Taylor, was suspect. Defendant argued that Taylor's credibility is suspect for several reasons: (1) Taylor was the only inmate in the gym who claims to have seen defendant hit Salisbury with the barbell collar; (2) Taylor lacks credibility because of his prior convictions for attempted burglary; and (3) Taylor is a member of a rival gang.

Defendant's attack on Taylor's credibility fails when the record is examined. It is certainly plausible that Taylor was the only person in the weight room who saw defendant throw the collar at Salisbury. The inmates would have been concentrating on their weight lifting and not the activities of other inmates. This is especially true where the defendant had made no prior threats against Salisbury.

Second, it is hard to see how any inmate-witness would not have a problem with credibility. Any inmate who testified would have at least one prior conviction or he would not be in prison.

Third, there is no evidence in the record to support defendant's contention that Taylor was a member of a rival gang. No evidence was produced to show that the Disciples and Black Gangsters Lynchmen were rivals of the Vice Lords.

Questions of credibility are properly within the province of the trial court; a reviewing court will not substitute its judgment where the evidence is merely conflicting. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.) Taylor's testimony, if believed by the trier of fact, was sufficient to prove defendant guilty beyond a reasonable doubt.

Defendant contends that the trial court erred in allowing testimony that defendant and Joe Lofton were members of the same gang. We disagree with the defendant and hold that the testimony was admissible.

In *People v. DeSavieu* (1973), 11 Ill. App. 3d 529, 297 N.E.2d 336, the prosecution theorized that the shooting of the victim was related to gang activity. The court found that testimony regarding defendant's gang membership was admissible to show a motive for the attack.

■■ In the case at bar, the State's theory was that the defendant was ordered by Joe Lofton, his "superior" in the Vice Lords, to attack Salisbury because Salisbury had disciplined Lofton earlier that afternoon. Evidence of defendant's gang membership was relevant to show that defendant had a motive to commit the aggravated battery on Salisbury.

■■ Defendant next argues that the trial court erred in allowing Desi Martin to be declared a hostile witness and in allowing Martin to be impeached by the use of prior inconsistent statements. Also, defendant contends that the trial court compounded its error by allowing the assistant State's Attorney trying the case to testify regarding Martin's prior statement and by failing to provide the jury with a proper limiting instruction.

Supreme Court Rule 238 provides:
> "If the court determines that a witness is hostile or unwilling, he may be examined by the party calling him as if under cross-examination. The party calling an occurrence witness, upon the showing that he called the witness in good faith and is surprised by his testimony, may impeach the witness by proof of prior inconsistent statements." (73 Ill. 2d R. 238.)

Rule 238 is applicable to two distinct situations: (1) the genuinely hostile and uncooperative witness; and (2) the occurrence witness whose testimony surprises and does affirmative damage to the case of the party calling him. (See *Sellers v. Hendrickson* (1977), 46 Ill. App. 3d 549, 360 N.E.2d 1235.) An occurrence witness called in good faith may be impeached by the use of his prior inconsistent statements if his testimony was both surprising and affirmatively damaging to the party calling him. E. Cleary & M. Graham, Handbook of Illinois Evidence §607.4 (3d ed. 1979).

■■ Martin was an occurrence witness. While he did not claim to see the offense happen, *i.e.*, he was not an eyewitness, he was present at the time and place the offense occurred. (See, *e.g.*, *O'Boyle v. Greco Excavating Co.* (1972), 9 Ill. App. 3d 234, 292 N.E.2d 90.) Martin's testimony was surprising to the State. It also affirmatively damaged the State's case because Martin testified that he was present at the time and place of the offense and that defendant was not there. If defendant was not present when the offense took place, it would have been impossible for him to have committed the offense charged. The effect of Martin's testimony was to strengthen defendant's case and weaken the State's case. There-

fore, the prosecution was entitled to impeach Martin with evidence of his prior inconsistent statements.

Defendant argues that the impeachment was improper because the assistant State's Attorney trying the case took the stand and testified regarding Martin's prior statements and that the trial court failed to properly instruct the jury that the prior statements could be considered only as effecting the credibility of the witnesses.

Generally, testimony by the prosecuting attorney is not encouraged. This reluctance to allow testimony by the prosecutor stems from the belief that jurors will give greater weight to the testimony of a prosecutor than testimony of an ordinary citizen because of the prosecutor's official position. (*People v. Gendron* (1968), 41 Ill. 2d 351, 243 N.E.2d 208.) Such testimony is allowed when the trial court, in its discretion, finds that the testimony is necessary. *People v. Langdon* (1980), 91 Ill. App. 3d 1050, 415 N.E.2d 578.

In this case, Charles Frank was the only person who knew whether Martin had made certain prior inconsistent statements. His testimony was necessary to impeach Martin. The trial court did not abuse its discretion in allowing Frank's testimony.

Following Mr. Frank's testimony, defendant moved to strike Frank's testimony or to limit its application. The prosecution concurred that a limiting instruction was necessary. The court stated, in the presence of the jury, that it would "limit the testimony of Mr. Frank to being impeaching of the witness Martin who preceded him on the stand." Defendant did not tender a written instruction on this point, but both counsel for defendant and the prosecution mentioned the limited use that could be made of Mr. Frank's testimony.

The trial court's oral instruction and the statements made by counsel in their closing arguments were sufficient to apprise the jury of the limitations upon their consideration of Frank's testimony. Furthermore, defendant has shown no evidence of prejudice resulting from the instruction on this point.

Defendant contends that he was denied a fair trial where the prosecution questioned Kevin Scott about his gang affiliation without a good-faith basis for believing that the witness was a gang member.

In *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353, the supreme court reversed defendant's conviction for murder and remanded for a new trial where the prosecution made several insinuations of misconduct in its cross-examination of defense witnesses and then failed to produce rebuttal witnesses when the defense witnesses had denied the misconduct. Defendant did not waive the error by failing to object when the questions were asked; he preserved the error by moving for a mistrial at the close of all the evidence.

In the present case, defendant did not object to the testimony, did not

move for a mistrial at the close of all the evidence and failed to include the alleged error in his post-trial motion. Under these circumstances, any alleged error is waived. Even if defendant had properly raised his objections to the testimony, an examination of the record reveals that any error was harmless beyond a reasonable doubt.

Finally, defendant argues that the trial court erred in allowing the jury to go home after the case had been submitted to them and return the next day and resume their deliberations.

Section 115—4(*1*) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 115—4(*1*)) provides:

> "When the jury retires to consider its verdict an officer of the court shall be appointed to keep them together and to prevent conversation between the jurors and others. Upon agreement between the State and defendant or his counsel the jury may seal and deliver its verdict to the Clerk of the court, separate, and then return such verdict in open court at its next session."

Defendant contends that the trial court's decision to allow the jury to go home at night and return and resume its deliberations in the morning was a violation of section 115—4(*1*). Defendant cites the case of *People v. Ritzert* (1974), 17 Ill. App. 3d 791, 308 N.E.2d 636, as authority for its position.

In *Ritzert*, defendant was convicted of driving while intoxicated. At 4:50 p.m. the jury retired to consider its verdict. At 9 p.m. no verdict had been reached. The court requested counsel to agree on a proper procedure: should a mistrial be declared or should the jury be sent home for the night and ordered to resume deliberations in the morning? Defendant wanted the mistrial, the State wanted to send the jurors home. The judge opted to send the jury home. When the jury returned the next morning, defendant objected to the procedure. The trial court noted that no objection was made when the jury was released.

On appeal, the Second District reversed defendant's conviction. The court indicated, in *dicta*, that the requirements of subsection (*l*) could not be waived by agreement of the parties.

> "Defendant's failure to object to the separation is in this instance of no consequence. Not only does the record clearly negate any implied agreement but the agreement sought was not that which is permitted under the statute where it is only after the jury has concluded deliberations and sealed their verdict that they may separate by agreement of counsel.
>
> Aware that the federal courts are neither governed by statute or common law on the issue, we nevertheless take cognizance that most circuits have held that separation of the jury during deliberation is not per se reversible error or a lack of due process. We empathize with the more enlightened federal practice, but adop-

tion of such procedure in Illinois lies with the legislature. Subsection (*l*) clearly and unambiguously requires that a jury be kept together during deliberations prior to reaching a verdict. The trial court, without any support in the law, committed error in allowing the jury's separation during deliberation." 17 Ill. App. 3d 791, 795-96, 308 N.E.2d 636, 639.

We choose not to follow the *dicta* in *Ritzert* concerning the ability of a defendant to knowingly and intelligently waive the statutory requirement found in 115—4(*l*). In the case at bar, defendant, through his attorney, agreed to allow the jury to go home for the evening. Defendant did not object the following morning when the jury returned and resumed its deliberation. Defendant did not raise the issue until his post-trial motion. Defendant's counsel stated that he knew a jury separation was improper when he agreed to it, but that he thought allowing the jury to go home was "worth the gamble" because the jury might return a verdict of not guilty. Defendant did not allege or present evidence that the jurors were subjected to any improper influences during the period of their separation.

In *People v. Kenzik* (1956), 9 Ill. 2d 204, 137 N.E.2d 270, defendant was charged with murder. He proceeded *pro se*. During the course of the trial, the trial judge explained to the defendant that he had a right to have the jurors kept together during the trial. However, defendant assented to the separation of the jury during the trial. Defendant was found guilty and sentenced to death.

On appeal, the supreme court reversed and remanded. The court held that defendant had not made a knowing and intelligent waiver of his rights and that these elements must be present to constitute an effective waiver. We read *Kenzik* as supporting the availability of waiver in these situations, so long as the purported waiver is knowingly and intelligently made.

■■■ Constitutional rights may be waived by a defendant if the waiver is knowingly and intelligently made. (See, *e.g., Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232.) A statutory right, such as the right to a preliminary hearing or defendant's right to be present at trial, may also be waived. (*People v. Williams* (1966), 36 Ill. 2d 194, 202, 222 N.E.2d 321; *People v. Krison* (1978), 63 Ill. App. 3d 531, 380 N.E.2d 449.) We find that the facts and circumstances in this case support a finding that defendant, through his attorney, knowingly and intelligently waived any claim of error regarding the separation of the jury.

The judgment of the circuit court of Livingston County is affirmed.

Affirmed.

MILLS and TRAPP, JJ., concur.