THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DONALD J. WHALEN, Defendant-Appellant.

Fourth District   No. 4—91—0974

Opinion filed December 10, 1992.

KNECHT, J., concurring in part and dissenting in part.

George F. Taseff, of Bloomington, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

Following a jury trial in the circuit court of McLean County, defendant Donald J. Whalen was convicted of two counts of first degree murder, in violation of section 9—1(a)(1) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(1)), and sentenced to a term of 60 years' imprisonment.

On appeal, defendant contends it was reversible error to (1) exclude his expert witness because of late disclosure; (2) admit evidence of his purchase and use of cocaine; and (3) exclude evidence tending to show that another committed the crime. We disagree and affirm.

On the morning of April 6, 1991, the body of William Whalen was discovered at the Twenty Grand Tap in Bloomington, Illinois. Police arrested his son, defendant Donald Whalen, and charged him with two counts of first degree murder. The decedent had been struck 39 times with blunt instruments and stabbed over 30 times with several sharp instruments. In its initial discovery response, the State disclosed evidence of an alleged match between a bloody latent palm print found on a broken pool cue and inked palm prints of defendant.

Defendant filed his discovery response on September 30, 1991, and provided notice of an intended alibi defense. No mention was made of an intent to seek an expert witness. Defendant then filed a supplementary discovery response on October 21, 1991, that listed 24 additional witnesses, but made no mention of seeking an expert witness.

On November 4, 1991, eight days before trial, defense counsel filed another supplemental discovery response disclosing his intent to call an expert witness, Dr. Zeldes. Zeldes' resume was attached to the discovery response, but there was no indication of the nature or content of his proposed testimony. The State telephoned Zeldes the same day and learned that he was not certain what he would be asked to testify about, although he did indicate that one area of his expertise is in fingerprint analysis.

The next day, November 5, 1991, a hearing was held on the State's motion to strike the supplemental discovery and bar the testimony of Zeldes. The State argued that as recently as October 28, 1991, defense counsel advised them that the only evidence he had was his alibi evidence and character witnesses. No mention was made of finding an expert witness in fingerprint analysis. The State's trial strategy focused on its expert testimony versus defendant's alibi. This last-minute revelation of expert testimony supporting defendant's position represented a major change in the trial strategy which the State claimed would require more than a single week for adequate preparation. The State argued that the situation was further aggravated by the fact that it was given no information regarding Zeldes' findings.

Defense counsel contends the delay in hiring Dr. Zeldes was caused by lack of funds. The funds allegedly became available approximately 10 days before the November 5, 1991, hearing. The prints

were faxed to Zeldes approximately seven days prior to the hearing, and defense counsel was unable to speak to Zeldes personally because defense counsel was involved with a family matter regarding surgery on his father.

The State questions the credibility of defense counsel's argument on lack of funds. It questions why defendant never filed a motion for the appointment of an expert alleging an inability to pay. Defense counsel offered to set up a phone conference between Zeldes and the assistant State's Attorney on the following day. The trial court found this solution to be insufficient, claiming defense counsel had had plenty of time to get the job done. The trial court granted the State's motion to bar the expert's testimony.

On November 6, 1991, defense counsel filed a motion to reconsider the court's ruling barring Dr. Zeldes' testimony. Attached to the motion was a letter from defense counsel's private investigator, who had spoken with Zeldes on the telephone and summarized the proposed testimony. At a hearing held the following day, defense counsel stated that he was prepared to have Zeldes issue a report and have it faxed to the court immediately. He argued that there was no undue delay on the part of the defense from the point in time when the witness first became available to him and when he formed the intent to call him as a witness.

Defense counsel argued that Zeldes' testimony would cast doubt upon the only physical evidence linking defendant to the crime and to exclude this testimony would deprive him of a fair trial. The State argued that it was now three days since the name of the expert had been disclosed and it still did not have any type of report indicating the basis for the expert's determination. Before a decision could be made to reconsider, the State argued that defendant should produce Dr. Zeldes, in person, along with whatever he used to make his comparison.

The trial court noted that defense counsel had not brought to the court's attention any problems concerning disclosure of expert witnesses, and that a firm trial date had been set for over 60 days. Before issuing its ruling on the motion to reconsider, the court engaged in the following dialogue with defense counsel:

> "[THE COURT:] I can only think of one possible mitigation in this matter and that is if you want a continuance is the only possible situation we can run into.
>
> [Defense counsel]: Could—If we did move for a continuance would we still be able to try it this calendar?

THE COURT: No way it can be tried this calendar with a continuance.

[Defense counsel]: When would the next available trial—

THE COURT: January.

[Defense counsel]: May I have a moment to discuss it with my client?

[Defendant]: Don't need a moment.

[Defense counsel]: My client indicates, Your Honor, that he does not desire a continuance.

THE COURT: Well, that's entirely up to you. I would afford a continuance potentially you see—

[Defense counsel]: I understand.

THE COURT: Seems to me that's the only way we can cure the problem we have, and even that imposes considerable difficulty on the State because they have at least an out-of-state witness that's been subpoenaed. They have a witness out of the penitentiary, don't you, that's been [']writted out[']?

[Prosecution]: Yes.

THE COURT: And we have, you know, we've set aside the time for this.

[Defense counsel]: Could we have—Could we have one more minute?

* * *

[Defense counsel]: My client wishes to proceed to trial on the 12th, Your Honor."

Motion to reconsider was denied, and the action proceeded to trial on November 12, 1991.

■ The correct sanction to be applied for violation of a discovery rule is left to the trial court's discretion, and the judgment of the trial judge is given great weight. (*People v. Morgan* (1986), 112 Ill. 2d 111, 135, 492 N.E.2d 1303, 1312.) This rule is balanced against the principle that few rights are more fundamental than that of an accused to present witnesses in his own defense. (*Taylor v. Illinois* (1988), 484 U.S. 400, 98 L. Ed. 2d 798, 108 S. Ct. 646.) The exclusion of evidence is a drastic measure, applicable to flagrant violations where the uncooperative party demonstrates a " 'deliberate contumacious or unwarranted disregard' " of the court's authority. *People v. Rayford* (1976), 43 Ill. App. 3d 283, 286, 356 N.E.2d 1274, 1277, quoting *Schwartz v. Moats* (1971), 3 Ill. App. 3d 596, 599, 277 N.E.2d 529, 531.

Even so, the Supreme Court rejected the argument that preclusion of evidence is *never* a permissible sanction for a discovery violation:

"[I]t is neither necessary nor appropriate for us to attempt to draft a comprehensive set of standards to guide the exercise of discretion in every possible case. It is elementary, of course, that a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests." *Taylor*, 484 U.S. at 414, 98 L. Ed. 2d at 814, 108 S. Ct. at 656.

■ The principal reason for notice rules is prevention of surprise to the opposing party, not punishment of the proponent of the evidence for mere technical errors or omissions. Other factors considered before a witness preclusion sanction is employed to enforce discovery rules are effectiveness of less severe sanctions, materiality of the testimony to the outcome of the case, prejudice to the other party caused by the testimony, and evidence of bad faith in the violation of the discovery rules. *United States ex rel. Enoch v. Hartigan* (1985), 768 F.2d 161.

Defendant contends that the preclusion of relevant defense testimony is too harsh a sanction where there is no evidence that defense counsel willfully violated discovery rules in order to obtain a tactical advantage. The State counters that there is more than sufficient evidence of willful behavior designed to obtain a tactical advantage. Furthermore, the State argues that eight days would be insufficient time to investigate Zeldes' background, potential bias, and qualifications while simultaneously reworking its entire trial strategy. We need not address these arguments, since we find that defendant's refusal of an offer to continue the trial to a later date effectively waived this issue for purposes of review.

The Supreme Court in *Taylor* acknowledged that a sanction less drastic than evidence preclusion is always available. "Prejudice to the prosecution could be minimized by granting a continuance or a mistrial to provide time for further investigation ***." (*Taylor*, 484 U.S. at 413, 98 L. Ed. 2d at 813, 108 S. Ct. at 655.) The trial court offered a continuance of approximately two months and, after consulting with defendant, the offer was refused. Defendant cannot be permitted to complain of an alleged error which was invited by his behavior and preserved through his rejection of the only reasonable solution. See *People v. Moore* (1988), 178 Ill. App. 3d 531, 533 N.E.2d 463.

■ Defendant argues the court gave no assurance that the expert would be allowed to testify, even if the continuance was requested. Furthermore, he argues that the court gave no assurance that the continuance would be granted if it was requested. Appellate counsel is

ignoring the clear interpretation of the evidence as shown by the transcript quoted above. No other reasonable interpretation can be given to this discussion but that defendant was offered the use of Dr. Zeldes' testimony in exchange for a continuance. The fact that the continuance would delay the trial until January did not prevent waiver. Defendant's claim that the trial court might have refused to grant the continuance, after suggesting that counsel should request one, is unconvincing.

Alternatively, defendant argues that he was never admonished that his decision to proceed to trial on the scheduled date effectively waived his right to present a witness in his defense. Consistent with waivers in other sixth amendment contexts, defendant contends that the court is required to determine whether defendant knowingly, intentionally, and voluntarily relinquished his constitutional right to compulsory process and to present witnesses in his defense. In support, defendant cites *Faretta v. California* (1975), 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525, and *Patterson v. Illinois* (1988), 487 U.S. 285, 101 L. Ed. 2d 261, 108 S. Ct. 2389. Both cases involve waiver of the sixth amendment right to counsel. We find no support in these cases for defendant's argument.

Next, defendant claims the court committed reversible error in allowing the State to present testimony that defendant purchased cocaine in Chicago shortly after the death of his father. At trial, William Craig Elliott testified that defendant was involved in a $3,000 purchase of cocaine on April 9 and 10, 1991, three days after his father's death. The State maintains that evidence of the cocaine purchase tended to establish a motive for the murder. Defendant claims there was insufficient evidence to establish the cocaine purchase as motive and that proof of defendant's need for money could have been established without reference to the actual cocaine purchase. Accordingly, the evidence is claimed to have been grossly prejudicial and should have been excluded.

The State theorized that defendant had a poor relationship with his father and killed him, in part, to support his cocaine habit. The State presented evidence that defendant had a $100-per-day cocaine habit. One month prior to the murder, defendant became involved in a fight with his father at the tavern. His father had also kicked him out of the family residence. A police investigator testified that defendant told him that he owed his father $350 and was trying to avoid seeing him. This conflicts with defendant's testimony that he worked at his father's tavern the night before his murder and was also scheduled to work the following day. Evidence also established that defendant was

an unemployed laborer who tended bar on a part-time basis. He had no checking or savings account. On the morning of the day before the murder, defendant borrowed $50 from his mother.

When police arrived at the scene of the crime, the door to the safe was open with no money inside. Evidence was heard that as much as $900 could have been taken in during the previous day's business. Two hundred and forty dollars in small bills were left in the cash register. No evidence established the actual amount in the safe on that day.

Over defense counsel's objection, William Elliott testified that on April 9, 1991, defendant told him he had approximately $5,000 and wanted to go to Chicago to buy cocaine. Defendant allegedly purchased four ounces of cocaine for $3,000 and then returned to Bloomington with Elliott. The jury was properly instructed to consider evidence of the cocaine purchase solely in terms of the issues of intent and motive. Defendant denied these allegations, claiming that he had never met Elliott, and never possessed $5,000 in cash nor purchased any cocaine with Elliott.

The State then produced evidence that a few weeks later defendant sold his family's lawn mower for $500. The lawn mower was later reported stolen by his brother and mother. Defendant also sold his car. Between the time of his father's death and the time he was arrested, defendant cashed checks from his mother totalling nearly $5,000.

Defendant claims there is no direct link between his alleged purchase of cocaine shortly *after* his father's death and his alleged motive for murdering him a week earlier. Defendant testified that he never had a drug problem until after his father died. A few weeks after his father's death, he admitted himself into a drug rehabilitation center.

Defendant points out three inconsistencies in the murder-for-drug-money theory: (1) no one knew how much, if any, money was in the safe; (2) there was no explanation for the $240 left in the cash register; and (3) no evidence that he knew how to open the safe. Defendant sees the alleged purchase of cocaine as separate and distinct from the charge of murder. Furthermore, defendant claims that evidence of his possession of a large sum of cash could have been accomplished without mentioning that the money was used to purchase cocaine.

The State's theory of defendant's motive is comprised of two elements. First, he needed money to satisfy his cocaine habit. Since he had worked part-time in the family-owned tavern before, he would know that a large sum of money would be on hand at the close of business late Friday night. Second, the State sought to establish that

defendant had a much closer relationship with his mother and would be able to get money from her to satisfy his cocaine habit much more easily if his father was out of the way. The significance of the evidence showing that he received large amounts of money from his mother and sold several items after the homicide is unclear, the State argues, without the drug sale and drug use providing the necessary attitude of desperation required to kill his own father.

Evidence of other crimes is admissible if it is relevant for any purpose other than to show the defendant's propensity to commit a criminal offense. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, 824.) Generally, while any evidence which tends to show that an accused had a motive for committing murder is relevant, to be competent, it must, at least to a slight degree, tend to establish the existence of the motive relied on. (*People v. Stewart* (1984), 105 Ill. 2d 22, 56, 473 N.E.2d 840, 857.)

> "The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and that court's decision may not be overturned on appeal absent a clear abuse of discretion. [Citations.] Such an abuse of discretion will be found only where the trial court's decision is ' "arbitrary, fanciful or unreasonable" ' or ' "where no reasonable man would take the view adopted by the trial court." ' " (*People v. Illgen* (1991), 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519, quoting *People v. M.D.* (1984), 101 Ill. 2d 73, 90, 461 N.E.2d 367, 375, quoting *Peek v. United States* (9th Cir. 1963), 321 F.2d 934, 942.)

Evidence of a defendant's uncharged misconduct undermines the presumption of innocence. (*People v. Hendricks* (1990), 137 Ill. 2d 31, 52, 560 N.E.2d 611, 620.) But motive, although not an element of murder, may be a material factor in establishing guilt, particularly when the only evidence is circumstantial. In some circumstances "it is possible for the State to offer evidence tending to establish a defendant's motivation even though it involves the potential of disclosing a defendant's prior immoral or improper conduct." (*Hendricks*, 137 Ill. 2d at 53, 560 N.E.2d at 621.) We find no abuse of discretion in the admission of William Elliott's testimony.

Next, defendant claims the court committed reversible error in excluding the testimony of Robert McElvaney and Detective Richard Davis which tended to show that another person committed the offense with which defendant was charged and of which he was convicted. Following the State's objection, defendant was allowed to make an offer of proof to determine whether the jury would be al-

lowed to hear the testimony of McElvaney and Davis. The following facts were elicited.

The night before Bill Whalen's murder, Robert McElvaney was at the Twenty Grand Tap drinking Pabst Blue Ribbon beer. As a result of a confrontation between McElvaney and two other customers, the decedent asked McElvaney to leave the tavern. McElvaney was a friend of the victim, and he left without argument. No evidence was presented that any force was used to eject him from the tavern. This was not the first time he had been asked to leave and, when asked if he was upset with the decedent, he replied that he was not. Before leaving, he told Bill Whalen that he would see him again the next day.

Upon learning of McElvaney's ejection from the tavern the night before, two detectives went to McElvaney's residence at 7 a.m. on the day of the murder. McElvaney was fully dressed, except for being barefoot, and the detectives found this unusual based on their prior contacts with him. After telling McElvaney there had been a disturbance at the Twenty Grand Tap, McElvaney stated that, "I wouldn't hurt Bill Whalen. Bill Whalen is my buddy. What did I do?" Defendant stresses the fact that at the time the statement was made, no news reports had been released concerning Whalen's murder. Also noted is the fact that a number of empty beer cans were found at the crime scene, and one of them was a Pabst Blue Ribbon can. The trial court barred the evidence on grounds that there was no evidence of animosity between McElvaney and the deceased. Defendant contends that his constitutional right to present witnesses in his defense has been violated.

■ A defendant may prove any fact or circumstance tending to show that the crime was committed by a person other than himself, but that right is not without limitations. (*People v. Nitti* (1924), 312 Ill. 73, 90, 143 N.E. 448, 454; *People v. Enis* (1990), 139 Ill. 2d 264, 281, 564 N.E.2d 1155, 1161.) A trial court may reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty, or if it is speculative in nature. (*Enis*, 139 Ill. 2d at 281, 564 N.E.2d at 1161; *People v. Howard* (1991), 147 Ill. 2d 103, 143, 588 N.E.2d 1044, 1060.) The trial judge has a wide scope of discretion in ruling on issues of relevancy and materiality and its ruling should not be reversed absent a clear showing of abuse of that discretion. *Enis*, 139 Ill. 2d at 281, 564 N.E.2d at 1161; *People v. King* (1978), 61 Ill. App. 3d 49, 55, 377 N.E.2d 856, 860.

The State argues persuasively that McElvaney's testimony would provide nothing more than a possible motive for committing the murder. *People v. Columbo* (1983), 118 Ill. App. 3d 882, 455 N.E.2d 733,

is cited for the principle that evidence of possible motive, without more, is insufficient to require admission of the evidence.

In *Columbo*, defendant subpoenaed two business acquaintances of the victim in an effort to show that they harbored animosity toward him and, therefore, had motive to murder him. Both witnesses were questioned outside the presence of the jury, and both indicated that, if called to testify, they would invoke their privileges under the fifth amendment. Defense counsel requested the court's permission to ask the questions before a jury anyway, but the court refused. On appeal, the trial court's refusal to allow testimony regarding the witnesses' relationships with the decedent was upheld. The evidence was found to be purely speculative and lacking the requisite specificity required by law so as to ensure that extraneous and irrelevant matters are excluded from the jury.

In support, the *Columbo* decision cited *People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590, where the trial court refused to allow testimony of a witness who had threatened the murder victim. The witness, James Basford, testified outside the presence of the jury that several months prior to the murder he had fired a blank cartridge in the direction of the victim, burning his jacket. Three months before the murder, he told the victim that he should have his "block knocked off." (*Dukett*, 56 Ill. 2d at 448, 308 N.E.2d at 599.) When someone asked him whether he committed the murder, he told the person that he did not know if he did or not. This was later explained as a smart remark. The chief of police also testified outside the presence of the jury that Basford had inquired about developments in the case on three or four occasions, asking whether he had been cleared of suspicion.

The supreme court found the evidence was properly excluded, as it merely showed that Basford disliked the victim and was concerned that he would be accused of the crime. As such, evidence of this possible motive, without more, was held to be entirely speculative.

In *Howard*, defendant was denied the opportunity to question the sole eyewitness to a murder on the question of whether she was involved in a romantic relationship with the victim. According to statements of counsel at the hearing on the State's motion *in limine*, both the witness and the victim were married at the time of the murder. Defense counsel represented that the police had initially investigated the case as a family-related homicide and had questioned the witness' husband and given him a lie detector test. Defendant asserted that evidence that the witness was romantically involved with the victim suggested that the witness' husband, or the victim's wife, had motive

to commit the murder. Additionally, the love affair provided motive for the witness to misidentify the actual offender.

The supreme court found no error in the trial court's exclusion of evidence on the subject of her marriage and the nature of her relationship with the decedent. Evidence of a possible motive, without evidence linking either spouse to the murder, was held to be groundless and based upon speculation.

■ In the present case, the only evidence linking McElvaney to the crime scene is the fact that one of a number of empty beer cans found at the scene was the same brand that McElvaney drinks. No evidence was presented that McElvaney had ever touched this can, nor is there any evidence of animosity between McElvaney and the deceased. To the contrary, all evidence points to a conclusion that their relationship was amicable. Finally, we are left with McElvaney's outburst to detectives that he would not hurt Bill Whalen, at a time when he had no reason to know of any injury to the deceased. This evidence is far too uncertain to form the basis for finding that the trial judge abused his discretion in excluding McElvaney's testimony.

Affirmed.

GREEN, J., concurs.

JUSTICE KNECHT, concurring in part and dissenting in part:
I agree with the majority opinion it was not an abuse of discretion to admit evidence of defendant's purchase and use of cocaine. This evidence arguably supported the State's murder-for-drug-money theory, and the trial judge appropriately exercised his discretion.

Defendant should have the same latitude in presenting evidence to support his theory of the case. Evidence that someone other than the defendant may have committed the offense is relevant and admissible when a close connection is demonstrated between the third person and the commission of the offense. (*People v. Maberry* (1990), 193 Ill. App. 3d 250, 263, 549 N.E.2d 974, 982; *King*, 61 Ill. App. 3d at 52, 377 N.E.2d at 859.) It is properly excluded if it is remote or speculative. (*Howard*, 147 Ill. 2d at 143, 588 N.E.2d at 1060; *People v. Ward* (1984), 101 Ill. 2d 443, 455, 463 N.E.2d 696, 702.) Defendant should have been permitted to introduce evidence which allegedly linked a third person to the victim's murder.

His offer of proof shows a patron of the Twenty Grand Tap was ejected from the tavern just hours before the murder. The victim asked this patron to leave because of a confrontation between the pa-

tron and two other customers. While the patron did not argue and did not appear upset, he *was* ejected.

On the early morning of April 6, just a few hours after the crime was discovered and before any information had been released to the media, two police detectives sought out the patron at his home. When advised there had been trouble at the tavern, the patron responded, "I wouldn't hurt Bill Whalen. Bill Whalen is my buddy. What did I do?"

Police sought out the patron precisely because he had had a drunken encounter with another customer and had been ejected from the tavern. They found him fully dressed and awake. The detectives thought this was unusual because of what they knew about his habits. The patron then responded in a manner which suggested he knew Bill Whalen had been harmed. This evidence tended to show someone other than defendant committed the murder.

None of the cases cited by the majority address the issue presented here. The offer of proof goes beyond establishing a possible motive for someone else to murder Bill Whalen. The majority infers the patron was not affronted by the ejection because he had been ejected before, and there was an amicable relationship between the patron and the victim. This analysis ignores the fact the patron had been at the scene of the crime just hours before the murder, was ejected from the tavern by the victim, was a regular customer who would know the closing routine, and responded to a police visit by denying he would ever hurt Bill Whalen at a time when *only* the authorities, and the guilty party or a witness, would know Bill Whalen had been murdered. This interpretation of the evidence, which defendant is entitled to suggest, is not extraneous or irrelevant.

I am confident the State could have presented evidence to undercut this theory on rebuttal, just as the evidence already presented during its case in chief would likely have overcome this theory. The point is, defendant ought to be given the chance to advance the theory, and he was denied that chance.

The importance of this error is enhanced by the exclusion of defendant's expert witness because of late disclosure. The trial judge carefully considered this issue and even suggested a continuance as a practical solution. The majority relies on the refusal of a continuance as a waiver of the issue. The record suggests defendant was offered the use of Dr. Zelde's testimony in exchange for a continuance, but the issue is not whether *we* understand the court's suggestion, but whether defendant understood the offer and its consequences.

The compulsory process clause of the sixth amendment of the United States Constitution ensures a criminal defendant " 'the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt.' " (*Taylor*, 484 U.S. at 408, 98 L. Ed. 2d at 810, 108 S. Ct. at 652, quoting *Pennsylvania v. Ritchie* (1987), 480 U.S. 39, 56, 94 L. Ed. 2d 40, 56, 107 S. Ct. 989, 1000.) The majority rejects defendant's argument that just as waiver of a sixth amendment right to counsel must be made knowingly, intentionally, and voluntarily, waiver of his right to compulsory process and to present witnesses in his defense must be made knowingly, intentionally, and voluntarily.

The right of a defendant to present evidence "stands on no lesser footing than the other Sixth Amendment rights." (*Washington v. Texas* (1967), 388 U.S. 14, 18, 18 L. Ed. 2d 1019, 1023, 87 S. Ct. 1920, 1923.) A constitutional protection can be waived only if it is made knowingly and intelligently. *People v. Lester* (1988), 165 Ill. App. 3d 1056, 1058, 519 N.E.2d 1127, 1129; *People v. Jackson* (1982), 105 Ill. App. 3d 750, 758, 433 N.E.2d 1385, 1391.

The record does not show defendant understood he was being asked to weigh the right to a prompt trial with the right to present a witness on his behalf. For an issue this important the trial court could and should have explicitly stated to *both* defendant and his attorney that defendant's expert would be permitted to testify *only* if the case were continued; and if the defendant did not agree to a continuance, then the court would not permit his expert to testify. The preclusion of defendant's expert would have been proper had the court clearly presented the alternatives to defendant and he then elected to proceed to trial and reject a continuance. The alternatives were not clearly presented and this record does not show waiver. If there was no waiver, then defendant's arguments on the preclusion of his expert witness should be addressed.

The less severe sanction of a continuance was available but was not properly explained to defendant. The likely testimony of the expert would have challenged the reliability of the bloody palm print comparison and was thus material to the outcome of the case. Since the State intended to establish defendant's presence at the scene by the palm print, a defense expert's challenge to the reliability of its palm print comparison would not necessitate reworking its entire trial strategy. The trial judge granted the State's motion to bar the expert's testimony, but nothing in the record suggests the trial court found that defense counsel wilfully violated the rules of discovery to

gain an advantage. Considering these factors, as relied on by the majority citation to *Enoch*, I believe the preclusion of the defense expert witness was too drastic in these circumstances.

I would reverse and remand for a new trial and accordingly dissent on this issue.