**NOTICE**
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210068-U

NO. 4-21-0068

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 18, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | McLean County |
| DONALD WHALEN, | ) | No. 91CF344 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott D. Drazewski, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Holder White and Steigmann concurred in the judgment.

**ORDER**

¶ 1     *Held:*   The trial court did not err when it denied defendant's petition for relief from
judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS
5/2-1401 (West 2018)).

¶ 2     On December 22, 2020, the trial court denied defendant Donald Whalen's petition

for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735

ILCS 5/2-1401 (West 2018)).  Defendant appeals, arguing the trial court abused its discretion in

failing to consider significant evidence that weighs on the side of petitioner's innocence and in

denying his petition.  We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Because this court's opinion in *People v. Whalen*, 2020 IL App (4th) 190171, 161

N.E.3d 314, extensively outlines the facts in this case, we need not repeat them here except as

necessary to explain our decision.

¶ 5            In November 1991, a jury found defendant guilty of murdering his father, William Whalen, at the Twenty Grand Tap, a tavern owned by defendant's mother and father.  The trial court sentenced defendant to a term of 60 years' imprisonment.  In his direct appeal, *People v. Whalen*, 238 Ill. App. 3d 994, 999, 605 N.E.2d 604, 608 (1992), this court held defendant could not complain he was not allowed to use an expert witness because defendant refused the trial court's offer to continue his trial, the court did not abuse its discretion in allowing the State to present evidence defendant purchased drugs in Chicago after his father's murder, and the court did not err by prohibiting defendant from introducing evidence regarding Robert McElvaney, whom defendant alleged may have murdered defendant's father.

¶ 6            In August 2017, defendant filed a petition for relief from judgment pursuant to section 2-1401 of the Code.  In April 2018, defendant filed a supplement to his petition.  In November 2018, the State filed an amended motion to dismiss the petition, which the circuit court denied.

¶ 7            In January 2019, the circuit court held an evidentiary hearing on defendant's petition.  In February 2019, the court allowed defendant's petition, vacated defendant's conviction, and ordered a new trial.  The State appealed.  This court reversed the circuit court's order granting the petition and vacating defendant's conviction.  *Whalen*, 2020 IL App (4th) 190171, ¶ 105.  This court explained the circuit court justifiably and understandably applied the wrong standard when ruling on defendant's petition based on this court's decision in *People v. Davis*, 2012 IL App (4th) 110305, ¶¶ 62-63, 966 N.E.2d 570, where "this court erred by equating the language 'probably change the result on retrial' with a 'reasonable probability' the result would change on retrial."  *Whalen*, 2020 IL App (4th) 190171, ¶ 100.

¶ 8            In reversing the circuit court's decision in the prior appeal in this case, this court

explained a defendant has a higher burden of showing a different result is probable, not just a reasonable probability. *Whalen*, 2020 IL App (4th) 190171, ¶ 100. This court "direct[ed] the trial court to determine whether it is 'probable' or 'more likely than not' a jury would acquit defendant after a new trial where the new evidence in this case is considered alongside the original trial evidence." *Whalen*, 2020 IL App (4th) 190171, ¶ 103.

¶ 9    On remand, after hearing arguments from the State and defense counsel, the circuit court denied defendant's petition. The court indicated the proper standard for it to apply was whether it was probable or more likely than not that a trier of fact would find defendant not guilty based on the "new" evidence defendant presented when considered alongside the evidence at defendant's original trial. The circuit court indicated this court's opinion, which vacated the circuit court's prior ruling, accurately summarized the circuit court's findings and the basis upon which the circuit court vacated defendant's conviction and granted defendant a new trial. After further review and analysis of the trial proceedings and the section 2-1401 evidentiary hearing, the circuit court made the following additional factual findings:

"First, the defendant was not convicted based upon biological evidence left by him at the crime scene. In fact[,] all of the trial evidence excluded the defendant as the source of any blood at the crime scene.

Two. The fact that defendant's DNA evidence as established by both Dr. Reich and Cellmark Forensics was not found at the murder scene on its own does not establish that he did not commit the crime. The defendant was found guilty without any biological evidence linking him to the murder.

Three. Since the defendant's trial, no one other than the victim has been identified positively as a source of DNA found at the crime scene. This is

distinguishable from the facts in the *Davis* case where newly discovered DNA evidence excluded the defendant as the donor of blood and semen that were left on bedding where the victim in that case, who was both raped and murdered, occurred, as well as at defendant's trial. The State had argued how serological evidence included the defendant as someone who could have committed the crime. And so there was biological evidence that was submitted at Mr. Davis'[s] trial that ultimately was determined to exclude him as the donor of that DNA.

The unknown mixed DNA profile that occurs on the three samples in this case from the analysis conducted by Dr. Reich, including someone other than the defendant and the victim, includes the possibility of contamination and does not link to anyone who could be linked to this murder.

Fourth. Whoever murdered the victim may have done so without leaving behind any DNA evidence.

Fifth. Randy McKinley never opined at trial whether the latent print was a put down or take away and was never asked for his opinion. Additionally, the trial prep outline does not make any reference to the latent prints as either being put down or take away.

Michelle Triplett, although she compared the defendant's print to the palm print on the cue[,] was never asked by any attorney if the defendant's palm print was not a match. This was not any new evidence that was presented that it was not—excuse me, there was no [new] evidence that was presented that it was not the defendant's palm print on the pool cue. So arguments in the alternative or statements in the alternative or the negative I should say other than the manner in

which I've described it.

Seven, although the substance on the pool cue in which the palm print was left was never scientifically determined to be blood, that was also not new evidence. The substance was never tested and the State introduced trial evidence as to why.

In conclusion, the court having considered all the trial evidence along with the new evidence submitted at the evidentiary hearings on the defendant's 2-1401 petition, both the testimony and exhibits, the authorities cited by counsel, the common law record, the official transcripts of the proceedings, case law precedent and otherwise being fully advised in the premises, the court hereby finds and orders as follows.

This court does not redecide the defendant's guilt on a 2-1401 petition. The trial court is required to scrutinize the facts and surrounding circumstances more closely. The sufficiency of the State's evidence to convict beyond a reasonable doubt is not the determination the trial court must make. If it were, the remedy would be an acquittal, not a new trial. Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do considering all the evidence both old and new together.

The petitioner is entitled to a new trial a[s] a matter of law when the newly discovered evidence is material, not cumulative, and of such a conclusive character that it is probable or more likely than not a jury would acquit the defendant after a new trial where the evidence in this case is considered alongside the original trial evidence. Based on this record, the court finds that petitioner has

not met his burden and the petition is hereby denied.  Defendant's convictions

[*sic*] are therefore reinstated, bond is ordered revoked."

The court then awarded defendant sentencing credit for the time defendant spent on electronic

monitoring or in custody from the date of the court's prior decision to December 22, 2020.

¶ 10        This appeal followed.

¶ 11                                II. ANALYSIS

¶ 12        On appeal, defendant argues the circuit court erred in denying his section 2-1401

petition.  According to defendant, the circuit court abused its discretion (1) by failing to consider

what defendant deems significant evidence that weighs on the side of his innocence and (2) by

finding other evidence was insufficient to probably change the result if he was retried.

¶ 13        To establish an actual innocence claim, a defendant must present evidence to

support his claim.  Our supreme court recently explained:

> "[T]he supporting evidence must be (1) newly discovered, (2) material and not
>
> cumulative, and (3) of such conclusive character that it would probably change
>
> the result on retrial.  [Citations.]  Newly discovered evidence is evidence that was
>
> discovered after trial and that the petitioner could not have discovered earlier
>
> through the exercise of due diligence.  [Citation.]  Evidence is material if it is
>
> relevant and probative of the petitioner's innocence.  [Citation.]  Noncumulative
>
> evidence adds to the information that the fact finder heard at trial.  [Citation.]
>
> Lastly, the conclusive character element refers to evidence that, when considered
>
> along with the trial evidence, would probably lead to a different result.  [Citation.]
>
> The conclusive character of the new evidence is the most important element of an
>
> actual innocence claim.  [Citation.]

Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. [Citation.] The new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citation.] Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *People v. Robinson*, 2020 IL 123849, ¶¶ 47-48.

¶ 14 The parties do not agree what standard of review should be applied to this case. Citing our supreme court's opinion in *Warrant County Soil & Water Conservation District v. Walters*, 2015 IL 117783, ¶ 51, 32 N.E.3d 1099, defendant states the circuit court's ultimate decision on a section 2-1401 petition is reviewed under the abuse of discretion standard of review. However, citing *People v. Burrows*, 172 Ill. 2d 169, 180, 665 N.E.2d 1319, 1324 (1996), the State argues we should apply a manifest weight of the evidence standard. For purposes of this case, we need not decide which standard is correct because under either standard we would affirm the circuit court's decision denying defendant's section 2-1401 petition.

¶ 15                                    A. Evidentiary Issues

¶ 16 Before we reach the circuit court's ultimate decision to deny defendant's petition, we address defendant's argument the circuit court erroneously ignored evidence regarding Robert McElvaney and William Craig Elliot.

¶ 17                          1. *Evidence Regarding Robert McElvaney*

¶ 18 Defendant first argues the trial court erred in not considering McElvaney's invocation of his fifth amendment right not to testify as new evidence. We note defendant cites no case law supporting his assertion a witness's invocation of his fifth amendment right

automatically constitutes evidence. This court is not a depository where an appellant can dump the burden of argument and research. *Elder v. Bryant*, 324 Ill. App. 3d 526, 533, 755 N.E.2d 515, 522 (2001). "Contentions that are supported by some argument, yet lack citations of authority, do not meet the requirements of [Illinois Supreme Court] Rule 341(e)(7)" (*Elder*, 324 Ill. App. 3d at 533, 755 N.E.2d at 522), now Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). As a result, defendant forfeited any assertion the circuit court erred by not treating McElvaney's invocation of his fifth amendment right as new evidence when ruling on defendant's petition.

¶ 19 Defendant does cite authority for the proposition a court can draw an adverse inference from a witness's invocation of his fifth amendment right not to testify in certain situations. *People v. Gibson*, 2018 IL App (1st) 162177, 105 N.E.3d 47; *People v. Whirl*, 2015 IL App (1st) 111483, 39 N.E.3d 114.

> "In a civil action, the Fifth Amendment does not forbid an adverse inference against a party who refuses to testify in response to probative evidence of alleged misconduct. [Citations.] As long as there is 'some' evidence to support the complainant's allegations, a court may consider a party's refusal to testify as further evidence of the alleged misconduct. [Citation.]
>
> While the circuit court may draw an adverse inference from a party's refusal to testify, it is not automatically required to do so. [Citations.] That said, the circuit court does not have unfettered—or unreviewable—discretion to decline to draw an adverse inference. To the contrary, as we held in *Whirl*, a failure to draw an adverse inference may be error, even though the inference is permissive, if there is no good reason why the inference should not have been drawn."

*Gibson*, 2018 IL App (1st) 162177, ¶¶ 85-86.

However, those cases are easily distinguishable from the situation here.

¶ 20      In *Gibson* and *Whirl*, the defendants in both cases accused Chicago police officers of abusing them until they each made a false confession or incriminating admission.  *Gibson*, 2018 IL App (1st) 162177, ¶ 1; *Whirl*, 2015 IL App (1st) 111483, ¶ 53-65.  In *Gibson*, the Torture Inquiry and Relief Commission (Commission) found credible evidence the defendant was abused and referred the defendant's claim to the circuit court for an evidentiary hearing. *Gibson*, 2018 IL App (1st) 162177, ¶ 2.  In *Whirl*, "[t]he Commission found that 'by a preponderance of the evidence, there is sufficient evidence of torture to conclude [Whirl's] Claim is credible and merits judicial review for appropriate relief.' "  *Whirl*, 2015 IL App (1st) 111483, ¶ 45.

¶ 21      During the judicial review in both cases, police officers who had been accused of abuse by the respective defendants invoked their fifth amendment right against self-incrimination.  *Gibson*, 2018 IL App (1st) 162177, ¶ 3; *Whirl*, 2015 IL App (1st) 111483, ¶ 68. In both cases, the First District found the circuit court erred by failing to draw an adverse inference the respective officers had abused the respective defendants into making admissions. *Gibson*, 2018 IL App (1st) 162177, ¶¶ 4-5; *Whirl*, 2015 IL App (1st) 111483, ¶ 107.  In *Gibson*, the First District stated:

> "[W]hen, in the face of a credible allegation, an officer of the court is unwilling to
> assure the court that he and his colleagues did *not* physically coerce a confession,
> when he determines that a truthful answer could subject him to criminal liability,
> the court should take careful note.  Here, because most of the witnesses
> disclaimed any ability to directly address the allegations of abuse, and the only

material witnesses capable of so rebutting asserted his fifth-amendment rights, it was error not to draw an adverse inference." (Emphasis in original.) *Gibson*, 2018 IL App (1st) 162177, ¶ 108.

¶ 22    In the case before this court, the circuit court did not err by refusing to draw an adverse inference against McElvaney because he invoked his fifth amendment right when called to testify at the evidentiary hearing. We note defendant presented no new evidence linking McElvaney to William Whalen's murder.

¶ 23    Defendant essentially argues McElvaney's guilt is established because he invoked his fifth amendment right when called to testify at the evidentiary hearing. We find no merit in this argument. McElvaney invoked his fifth amendment right nearly 28 years after William Whalen's murder when he knew defendant wanted to accuse him of the murder. As stated earlier, defendant had no more evidence linking McElvaney to the crime than it did when defendant was originally tried. At the time of defendant's original trial, McElvaney did not invoke his fifth amendment right when defendant called McElvaney as part of an offer of proof. McElvaney answered all the questions asked of him.

¶ 24    Defendant also argues the trial court here should have taken McElvaney's testimony during the offer of proof into consideration when determining whether a different result would probably occur if defendant was given a new trial. We disagree.

¶ 25    At the offer of proof hearing, the trial court considered whether defendant should be allowed to present the following evidence: McElvaney was present at the tavern the night William Whalen was murdered; William Whalen asked McElvaney to leave the tavern that evening after McElvaney was in a confrontation with other customers; and the police went to McElvaney's residence the next morning, spoke to McElvaney, and McElvaney stated he would

- 10 -

not hurt William Whalen after William's body was discovered but before his murder was public information. The trial court found an insufficient nexus between McElvaney and the murder based on what he told the police and his testimony before the court. The court noted McElvaney testified it was not unusual for William Whalen to ask him to leave the tavern and McElvaney showed no animosity toward William Whalen after William asked him to leave. Instead, McElvaney told William Whalen he would see him the next day.

¶ 26         This court affirmed the trial court's ruling on direct appeal (see *People v. Whalen*, 238 Ill. App. 3d 994, 999, 605 N.E.2d 604, 608 (1992)), noting the State persuasively argued McElvaney's testimony would provide nothing more than a possible motive for murdering William Whalen. *Whalen*, 238 Ill. App. 3d at 1003, 605 N.E.2d at 611. This court also pointed to the lack of evidence linking McElvaney to the murder, stating:

> "In the present case, the only evidence linking McElvaney to the crime scene is the fact that one of a number of empty beer cans found at the scene was the same brand that McElvaney drinks. No evidence was presented that McElvaney had ever touched this can, nor is there any evidence of animosity between McElvaney and the deceased. To the contrary, all evidence points to a conclusion that their relationship was amicable. Finally, we are left with McElvaney's outburst to detectives that he would not hurt Bill Whalen, at a time when he had no reason to know of any injury to the deceased. This evidence is far too uncertain to form the basis for finding that the trial judge abused his discretion in excluding McElvaney's testimony." *Whalen*, 238 Ill. App. 3d at 1005, 605 N.E.2d at 611.

Our supreme court also affirmed the trial court's evidentiary ruling. See *People v. Whalen*, 158

Ill. 2d 415, 431, 634 N.E.2d 725, 733 (1994). Because this evidence regarding McElvaney being asked to leave the tavern and McElvaney's statements to the police the next morning were not allowed at defendant's trial, it was not trial evidence nor was it new evidence. As a result, the trial court did not err by not considering it in determining whether it was probable a retrial would lead to a different result.

¶ 27 Defendant also points to the testimony of the victim's wife that she had never seen McElvaney kicked out of the tavern. Further, defendant points to McElvaney being the son of the chief of the Bloomington Police Department at the time of the murder as a reason why the police were not more skeptical of what McElvaney told them after William Whalen's body was discovered. According to defendant, this "new" evidence puts a different light on McElvaney's testimony during the offer of proof. However, defendant has failed to establish this evidence was not known to defendant or could not have been discovered through the exercise of due diligence before his trial. As a result, this information does not qualify as "new" evidence.

¶ 28                    2. *Affidavit of William Craig Elliot*

¶ 29 With regard to William Craig Elliot's affidavit, the circuit court ruled the affidavit did not constitute "new" evidence it would consider. Defendant provides no argument and cites no authority why the trial court erred in finding the affidavit did not constitute new evidence. As a result, we find defendant forfeited any argument the trial court erred.

¶ 30 Defendant does argue the circuit court erred by failing to recognize the affidavit still impacts Elliot's potential weight as a witness at any retrial. However, if the affidavit was neither "new evidence" nor evidence from the trial, the trial court did not err in not considering this evidence in determining whether it was probable defendant would be found not guilty if he was given a new trial.

¶ 31        Regardless of forfeiture, Elliott's affidavit would be of little help to defendant during a second trial. According to defendant's brief, "Elliott's affidavit in the 2-1401 petition avers that after [defendant's] father's death, [defendant] only had around $800 cash, not $3000 cash, as Elliot had testified at trial and that the investigating officers told Elliot that [defendant's] money had come from donations to the decedent's family."

¶ 32        This does not accurately reflect what Elliot's affidavit stated. According to the affidavit, Elliot never counted the money defendant had and could not say exactly how much money defendant had when they went to Chicago to purchase drugs. Elliot stated in the affidavit that after arriving in Chicago, he discovered defendant did not have as much money with him as he had led Elliot to believe. Because Elliot did not count the money defendant had, Elliot's affidavit does not establish how much money defendant possessed, only the amount defendant told Elliot he possessed.

¶ 33        Elliot noted he was frustrated with defendant because Elliot ended up having to pay more than he expected for the drugs. Elliot did not contradict his testimony that defendant told him he had $5000 and wanted to go to Chicago to buy drugs. The affidavit only contradicted Elliot's testimony that defendant paid $3000 for four ounces of cocaine in Chicago. According to the affidavit, when Elliot and defendant returned to Bloomington, Elliot gave defendant an ounce of cocaine because of the amount of money he paid. Elliot recalled he was able to purchase an ounce of cocaine for around $800 at that time.

¶ 34        As the State points out in its brief, the State's evidence of defendant's motive for killing his father would not be hampered by Elliot's affidavit. We agree with the State the exact amount or source of cash defendant used to purchase cocaine shortly after the murder carries little importance when defendant was having money problems before the murder. Further, this

was only part of the State's case establishing defendant's motive. The State presented other evidence of the strained relationship between defendant and his father and defendant's financial problems. Defendant's father had kicked him out of the familial residence. Defendant had borrowed $350 from his father and was trying to avoid him. Further, defendant had a fight with his father about a month before the murder. After his father's death, defendant moved back into the family home, cashed numerous checks from his mother, and sold the family's lawn mower for $500, which his mother and brother later reported as stolen.

¶ 35                    B. Circuit Court's Ultimate Ruling

¶ 36          Finally, defendant argues the circuit court erred in finding it was not probable a new trial would lead to a different result based on the new evidence and the original trial evidence. As noted above, defendant has not established the trial court erred in not considering information regarding McElvaney or Elliot's affidavit. As a result, we do not consider this information in our review of the denial of defendant's petition.

¶ 37          While defendant was able to present evidence his DNA was not found at the murder scene, this evidence does not place the trial evidence in a different light for at least two reasons. First, defendant was not convicted based on biological evidence. At defendant's trial, evidence was presented excluding defendant as the source of any blood found at the crime scene. Second, the new DNA evidence did not identify another possible assailant. Dr. Karl Reich noted he was confounded by the lack of DNA evidence of anyone other than the victim at the crime scene. According to Dr. Reich, a person using a knife without a blade guard—like the ones used in this case—likely would have cut him or herself and left DNA evidence at the scene. However, in this case, the murderer apparently was not cut. While a minute amount of DNA found on the knives belonged to neither the victim nor defendant, Dr. Reich acknowledged the

- 14 -

presence of the third-party DNA could have resulted from contamination after the murder. The knives were stored for 15 years in an open box with other evidence.

¶ 38     As to the palm print on the pool cue stick and whether the print was in blood or some other substance, defendant's expert, Michele Triplett, did not testify the palm print did not belong to defendant. Defense counsel never asked Triplett this question. Triplett did testify the print was suitable for comparison and appeared to be a "put-down" palm print, which was consistent with the State's evidence. As to whether the palm print was left in blood or some other substance, the State's evidence at defendant's trial noted the substance was never scientifically tested to avoid compromising the latent print. However, a similarly colored substance from another part of the pool cue was tested and determined to be blood. The jury at defendant's trial would have inferred testimony the palm print was in blood was based on the non-scientific observations of the witnesses at trial.

¶ 39     Defendant also notes at a new trial he could argue the palm print was left on the pool cue in a substance other than blood before the murder while defendant was at the tavern. However, while defendant could point out the substance the print was in was not scientifically determined to be blood, the State could inform the jurors the pool cue was recovered near wet blood and the print appeared to be in blood. Further, a similar looking substance on the pool cue was determined to be blood through scientific testing.

¶ 40     Further, the new evidence did not affect the shoeprint evidence in this case. As discussed in our prior opinion, the police discovered a bloody shoeprint at the murder scene. The size and type of defendant's shoe matched the shoe print although the wear pattern was not a match. However, defendant admitted to the police he had recently thrown away a pair of the same style shoes. *Whalen*, 2020 IL App (4th) 190171, ¶¶ 12-13. Finally, the new evidence in

this case does not hamper the State's motive evidence, which we discussed earlier.

¶ 41　　　　Based on the new evidence and the prior trial evidence, the circuit court did not err in determining it was not probable a retrial would lead to a different result in this case.

¶ 42　　　　　　　　　　　III. CONCLUSION

¶ 43　　　　For the reasons stated, we affirm the circuit court's denial of defendant's section 2-1401 petition for relief from judgment.

¶ 44　　　　Affirmed.