# Illinois Official Reports

## Appellate Court

---

**People v. Whalen, 2020 IL App (4th) 190171**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. DONALD WHALEN, Defendant-Appellee. |
| District & No. | Fourth District<br>No. 4-19-0171 |
| Filed | March 3, 2020 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 91-CF-344; the Hon. Scott D. Drazewski, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Don Knapp, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Tara Thompson and Elliot Slosar, of The Exoneration Project, of Chicago, for appellee. |
| Panel | JUSTICE TURNER delivered the judgment of the court, with opinion. Presiding Justice Steigmann and Justice Holder White concurred in the judgment and opinion. |

**OPINION**

¶ 1 On February 13, 2019, the trial court allowed defendant Donald Whalen's petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (Civil Procedure Code) (735 ILCS 5/2-1401 (West 2018)), vacated defendant's murder conviction, and ordered a new trial. The State appeals, arguing (1) defendant's claims related to a palm print on a pool cue stick are time-barred and should have been dismissed, (2) the trial court's decision was based on an incorrect standard put forth by this court in *People v. Davis*, 2012 IL App (4th) 110305, 966 N.E.2d 570, and (3) the trial court's decision to grant defendant's petition for relief from judgment following the evidentiary hearing was manifestly erroneous. We reverse the trial court's order granting defendant's section 2-1401 petition and vacating defendant's conviction. We remand this case for further proceedings so the trial court can determine whether a different result would be "probable" or "more likely than not" based on the new evidence in this case when considered alongside the original trial evidence.

¶ 2                                    I. BACKGROUND

¶ 3 The body of William Whalen, defendant's father, was discovered at the Twenty Grand Tap in Bloomington, Illinois, on the morning of April 6, 1991. He had been beaten and stabbed numerous times. William Whalen and his wife, Colleen Whalen, had owned the tavern for 23 years before William was murdered.

¶ 4 On May 31, 1991, nearly two months later, defendant was arrested and charged with his father's murder.

¶ 5 In its initial discovery response, the State disclosed evidence of an alleged match between a bloody latent palm print found on a broken pool cue and defendant. Eight days before his trial was scheduled to begin, defendant filed a supplementary discovery response disclosing his intent to call an expert witness. He did not initially disclose the nature or content of his expert's proposed testimony. The State contacted the expert who told the State he was not sure what he would be asked to testify about but indicated he was an expert in fingerprint analysis.

¶ 6 The State asked the trial court to bar the expert witness because the witness was not disclosed in a timely manner. The court granted the State's motion. However, in response to defendant's motion to reconsider, the court noted a firm trial date had been set for over 60 days and stated the only way to mitigate the situation was for defendant to request a continuance. Defendant said he did not want the case continued. As a result, the court denied the motion to reconsider.

¶ 7 At defendant's trial, evidence showed the victim was found at the tavern around 4:30 a.m. on Saturday, April 6, 1991. The tavern closed that morning around 2 or 2:15. The jury heard a significant amount of money was left at the tavern after the murder, including but not limited to $240 in the tavern's two cash registers and $630 in the victim's pocket. The jury also heard the tavern's safe was open and empty. At the section 2-1401 evidentiary hearing, the trial court noted a total of $1128 was left at the tavern after the murder.

¶ 8 A broken bar stool, two broken pool cues, and several knives were found near the victim's body. A bloody shoeprint containing the letters "CONS" was found on the tavern's floor.

¶ 9 Randall McKinley, a crime scene investigator at the Bloomington Police Department who worked the murder scene, recovered a piece of a broken pool cue stick from the floor by the

victim's body. He testified the piece of the cue stick "was laying near *** wet blood." He also testified "there was blood all over this particular piece of pool cue stick, some of which was in a dried state and some of which was still damp and drying." McKinley further testified he observed what he knew to be "ridge detail from what could be a fingerprint or a palm print or some type of *** a fingerprint in the red blood substance on this pool cue."

¶ 10       John Dierker, a latent print examiner at the Illinois State Police crime lab in Morton, testified defendant's palm print was on part of a pool cue found at the crime scene and collected as evidence. He described the palm print, which appeared to be in blood, as a "put-down" impression. Dierker opined defendant had blood on his palm before he grabbed the cue stick. Dierker explained to the jury the difference between a "put-down" print and a "take-away" print.

> "This impression is what we refer to as a put-down impression instead of a take-away, and I'll explain that a little bit here in a second. But these dark areas that you see that I have marked characteristics on is reproduction of the ridges on this particular ink palm print. So if I had—a good analogy for a put-down impression would be that if I had flour on my hand it would adhere to the ridge portion of the—on the hand. And then if I placed my hand on the object I'd have a reproduction of the ridge portion because that's where the flour was and it was transferred there. However, if there had been blood on this item and then handled, I believe we'd see a take-away impression ***. What I mean by take-away impression, if I have flour all over the object and pick it up or put my hand down and pick it up, I have got flour on the ridges, but what's left on the object is furrows, or the detail would be of the furrow portion instead of the actual ridges. So it appears to me that this is a put-down impression instead of a take-away."

¶ 11       With regard to the blood evidence, the jury was told blood found on the pool cue with the latent print was consistent with the victim's blood type, but not defendant's. The State's witnesses testified the blood taken from the cue stick came from an area away from the latent print so as not to interfere with the print's integrity. The jury was also told defendant could be excluded as the source of all blood taken from the crime scene that had been tested, including several pieces of broken pool cue sticks.

¶ 12       In addition to the palm print, the State presented evidence regarding defendant's shoes to bolster its case against defendant. The jury heard evidence defendant regularly wore a particular model of Converse shoes, which had a distinctive sole with the letters "CONS." The tread on this style of shoe matched a bloody shoeprint found on the tavern floor.

¶ 13       After defendant's arrest, his shoes were examined and determined to be the same length, width, brand, and model as the shoe that made the bloody shoe print at the crime scene. However, the jury heard defendant's shoes were not a match for the shoeprint because defendant's shoes had more wear than the shoe that left the print at the tavern. Further, no blood was detected on defendant's shoes. Although the jury heard this evidence regarding defendant's shoes, which were tested, it also heard evidence defendant told the police two days before his arrest that he had recently disposed of another pair of this same style of Converse shoes.

¶ 14       The State theorized defendant had a poor relationship with his father and killed him, in part, to support his $100 per day cocaine habit. His father had kicked defendant out of the family residence, but defendant returned home after his father's death. Two days before his arrest, defendant told the police he had a fight with his father a month before the murder and

had previously borrowed $350 from his father and was trying to avoid him. The jury also heard after the murder, but before defendant's arrest, defendant had cashed numerous checks from his mother, sold his car, and sold the family's lawn mower for $500, which his mother and brother later reported as stolen.

¶ 15    William Craig Elliot testified defendant was involved in a $3000 cocaine purchase in April 1991, just three days after his father's murder. According to Elliot's testimony, defendant said he had approximately $5000 and wanted to go to Chicago to buy drugs. Elliot testified defendant paid $3000 for four ounces of cocaine in Chicago. The jury was instructed to only consider this evidence for the purpose of showing defendant's intent and motive. Defendant denied the allegations and knowing Elliot.

¶ 16    Defendant testified on his own behalf and presented two alibi witnesses. According to defendant's testimony, he was at the tavern on Friday, April 5, 1991, around 11 a.m. His father was not at the tavern at the time. He ate lunch, played pool, and borrowed $50 from his mother. He left the tavern and returned to the house where he was living about 2 p.m. or 3 p.m. and stayed at the house the rest of the day. Todd Aeschleman, who also lived at the house, woke defendant around 1:15 a.m. on April 6 and talked to defendant for a while. Defendant testified he did not leave the house until he received a telephone call summoning him to the tavern.

¶ 17    Aeschleman testified he got home around 1 a.m. or 1:30 a.m. on April 6, 1991. Defendant was sleeping on the couch. According to Aeschleman, he woke defendant, and the two men talked for about 45 minutes. Defendant then went to bed about 2 a.m. Aeschleman stayed up until about 3 a.m. He testified he did not hear defendant leave the house at any time that night.

¶ 18    Pamela Hall, defendant's other housemate, testified she returned to the house around 8 or 8:30 on the evening of April 5. Defendant was at the house at that time. She later left but returned home around 3 a.m. or 3:30 a.m. on April 6. The other bedroom doors were closed. She saw defendant later that morning at 6:30 or 7 when she woke him to take a telephone call.

¶ 19    Defendant presented other witnesses who testified they had seen defendant and his father together in the weeks before the murder. The two appeared to be getting along. The defendant's brother and sister-in-law testified defendant and his father would have disagreements but were able to resolve them. Additional witnesses testified they saw defendant soon after the murder and did not notice anything unusual.

¶ 20    The jury found defendant guilty of murder, and the trial court sentenced him to a term of 60 years' imprisonment.

¶ 21    In his direct appeal, *People v. Whalen*, 238 Ill. App. 3d 994, 999, 605 N.E.2d 604, 608 (1992), this court held defendant could not complain he was not allowed to use his expert witness because defendant refused the trial court's offer to continue the trial to a later date. This court also ruled the trial court did not abuse its discretion in allowing the State to present evidence regarding defendant purchasing drugs in Chicago shortly after the murder. Finally, this court held the trial court did not err by prohibiting defendant from introducing evidence regarding Robert McElvaney, whom defendant contended may have committed the murder.

¶ 22    According to an offer of proof provided by defendant at his trial, McElvaney had been asked to leave the tavern by the victim the same night the victim was murdered because McElvaney was in a confrontation with two other customers. McElvaney left the tavern without incident and told the decedent he would see him the next day. McElvaney told the police he was a friend of the decedent and was not upset with decedent for asking him to leave

the tavern. While investigating decedent's murder at 7 a.m. the morning of the murder, two detectives went to McElvaney's residence before any news reports had been released about the murder. The detectives found it unusual McElvaney was dressed based on prior contacts with him. After the detectives told McElvaney a disturbance had occurred at the tavern, McElvaney responded, "I wouldn't hurt Bill Whalen. Bill Whalen is my buddy. What did I do?"

¶ 23 This court noted no evidence linked McElvaney to the crime scene other than the fact one of a number of empty beer cans found at the tavern was the brand McElvaney drank. No evidence showed any animosity between McElvaney and the victim. Instead, the evidence pointed to an amicable relationship. With regard to McElvaney's statement to the detectives, this court found this evidence was far too uncertain to find the trial court abused its discretion in not allowing defendant to introduce this evidence. Our supreme court affirmed this court's decision in *People v. Whalen*, 158 Ill. 2d 415, 431, 634 N.E.2d 725, 733 (1994).

¶ 24 On March 10, 2003, defendant filed a *pro se* motion for DNA testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (Criminal Procedure Code) (725 ILCS 5/116-3 (West 2002)). He filed amended motions on July 24, 2003, and November 19, 2004. Defendant asked for DNA testing to be done on nine blood swabs from various areas of the crime scene, hair found in the victim's hands, hair found on a table near the body, bloody knives found at the scene, and blood and hair samples from both the victim and defendant.

¶ 25 On February 16, 2005, the trial court conducted a hearing on defendant's second amended motion. During the hearing, the judge, defense counsel, and an assistant state's attorney visited the evidence vault to view the condition of the exhibits from defendant's trial. The assistant state's attorney noted it appeared several of the knives and parts of the cue sticks were just lying in the box together, unsealed. The parties agreed to consult with forensic-testing experts to determine whether testing could yield reliable results considering the storage conditions of the evidence.

¶ 26 At a hearing on March 14, 2005, the State noted personnel at the crime lab in Morton declared reliable testing could not be provided because the contamination factor was too high based on the condition of the knives as described by the State. Defense counsel contacted Dr. Karl Reich, who said it would be difficult to determine whether testing would provide a reasonable result without him examining the knives.

¶ 27 In May 2005, the parties and their experts met to examine the condition of the knives. On June 6, 2005, personnel at the Morton crime lab filed a report noting the crime lab had received the knives for testing analysis in 1991. In 1991, bloodstains were removed from the knives but not tested. After the bloodstains were removed from the knives, the knives were analyzed for latent prints using a variety of techniques. The knives were then returned to the Bloomington Police Department in sealed packages on October 2, 1991. During defendant's trial, the sealed packages containing the knives were opened. The report presumed the knives were placed back into the box without packaging after the trial was over. The report concluded the knives were subjected to outside influences once removed from their original packaging and the integrity of that evidence had been compromised. However, the bloodstains, which were removed from the knives before the knives were tested for latent prints, had been returned to the Bloomington Police Department in sealed packaging in May 2004. According to the report:

> "*It is strongly recommended that the original blood stain evidence from the knives and the scene swabs, which is located at the Bloomington Police Department, be analyzed since its integrity has not been violated. The stains have remained in a sealed condition*

*intact and unaltered all of these years. In our opinion, the knives and scene swab boxes should not be reanalyzed due to the possibility of contamination.*" (Emphasis in original.)

¶ 28 On June 7, 2005, defendant filed an argument in support of his second amended motion for DNA testing, stating as follows:

"Petitioner's arguments as to why the evidence sought by the requested testing are materially relevant to his claim of innocence are not complex. *Essentially the arguments, as set forth in Petitioner's Second Amended Motion[,] are that if DNA testing of the blood evidence on the knives, blood samples from various areas of the crime scene, or the hair evidence does not produce a match to the victim's DNA profile, that would both undermine important evidence presented by the State at trial to the effect that the blood and hair were all from the victim, and at the same time support Petitioner's arguments at trial that some unknown third party was the assailant and not Petitioner.* Because the different pieces of evidence requested to be tested could conceivably come back with a result favorable to Petitioner in any sort of combination, the potential exculpability of those results should not be pre-judged by the Court in deciding whether to order the testing, under the principles set forth above. A favorable result on few of the items of evidence might be determined to be as probative as to Petitioner's claim of actual innocence as a favorable result only as to the other items. For example, there would be no reasonable explanation consistent with the State's arguments at trial as to how the victim had hair from an unknown third party in both of his hands. If blood shed on the five knives and at numerous areas of the crime scene also matched the DNA from the hair of the unknown person in the victim's hands, Petitioner's assertion of innocence would be extremely hard to refute. For these reasons, the Court should not hesitate to order all of the testing requested." (Emphasis added.)

¶ 29 Dr. Karl Reich's report was also filed on June 7, 2005. According to his report, representatives of the Morton crime lab revealed the swabs used to collect blood evidence from the knives and different areas of the crime scene collected during the original processing of the evidence had been stored by the lab and then returned to the Bloomington Police Department in May 2004, but the police department had not located the swabs. After the date the evidence was examined, the missing swabs were located. Dr. Reich recommended these swabs be analyzed by DNA STR methods because it would provide important evidence to compare with DNA testing being requested on the knives themselves.

¶ 30 As for the knives, Dr. Reich's report acknowledged the possibility court personnel could have contaminated the evidence during or directly after defendant's trial. However, Dr. Reich recommended DNA analysis would need to be performed on the knives to determine whether contamination occurred and how probative testing results might be. Dr. Reich's report stated:

"DNA STR analysis of a 'contaminated' sample could be indicated by a mixed profile. Given the size of the stains on the exhibits (large) and the amount of potential contamination by simple handling (small), it is most likely that 'contamination' of the sort discussed *** would be present as a minor component to a major profile upon DNA STR analysis."

¶ 31 Dr. Reich recommended first testing the knives for human blood and then performing DNA STR analysis on stains that tested positive for blood. He noted information was not available

"as to the reliability and sensitivity" of blood-testing methods "on biological samples that have been prepared for latent print examination and subsequently stored for 15 years."

¶ 32    In July 2005, the trial court entered an order finding defendant met his burden in establishing a *prima facie* case for ordering DNA STR testing of the blood samples taken at the crime scene, hair samples, and blood samples taken from the five knives found at the crime scene. The trial court denied defendant's request to test the actual knives, finding defendant failed to meet the "chain of custody" requirement found in section 116-3 of the Criminal Procedure Code (725 ILCS 5/116-3 (West 2004)).

¶ 33    In October 2005, Dr. Reich submitted a supplement to his original report. In the supplement, Dr. Reich opined DNA results from a sample that only contained the victim's DNA would "provide little scientific evidence of use for the defense." However, a mixed profile of the DNA of the victim and an unknown third party would provide strong scientific evidence for the defense. According to the report:

> "Of all the evidence requested to be DNA tested, the hair samples in particular, both the preserved slides and the hair in the victim's hands are the most sensitive samples and provide the most likely route to obtaining the results required for pursuing postconviction relief under the current Illinois state statute. However, all of the evidence requested (including the knives) has the scientific potential to further Mr. Whalen's claim of actual innocence. All of our efforts and arguments are directed at preserving these samples and insuring the most robust scientific results of their analysis."

¶ 34    On October 5, 2007, defendant filed a third amended motion to allow DNA testing. He alleged the Morton crime lab had tested 47 exhibits taken from the crime scene. Defendant asserted none of the items tested, other than his own representative samples, contained DNA profiles that matched his profile. Defendant asked to be allowed to independently examine and retest certain items of evidence. He also requested forensic testing of additional items of evidence, including beer cans, drinking glasses, a piece of cloth with a red stain, and a partial ceiling tile with apparent blood transfer. He also renewed his request to test the five knives found at the scene.

¶ 35    On February 4, 2009, defendant filed a supplemental memorandum in support of his third amended motion to allow DNA testing. With regard to his request the knives themselves (and not just swabs previously taken from the knives) be tested for DNA, defendant made the following argument:

> "As Defendant's expert, Dr. Reich has previously opined, the swabs taken from the blades of the knives do not necessarily represent a representative sample of all the possible relevant DNA evidence on the blades, much less the knife handles, because the police who gathered the swab evidence did not likely take the sample with the possibility of DNA testing in mind. Given the bent and broken nature of the knives, it is highly likely that epithelial cells from the person using the weapon exist in fairly large quantity due to the large amount of force that must have been used to stab the victim so many times."

Defendant continued his argument, stating "given the probability that the victim's attackers left a large amount of epithelial cells on the knives, denying Defendant the right to test the knives themselves violates Defendant's due process rights *** because such evidence has a 'reasonable probability' of showing Defendant is innocent."

¶ 36    On July 1, 2009, the trial court entered an order on all of defendant's pending amended motions to allow DNA testing. The court denied defendant's request for DNA testing on a Marlboro cigarette butt (exhibit 45A), a Cambridge cigarette butt (exhibit 45B), an Old Milwaukee beer can (exhibit 55), shot and rock glasses (exhibits 56 and 58), an Old Milwaukee beer can from a cooler (exhibit 59), a portion of a ceiling tile (exhibit 80), and a Pabst Blue Ribbon can ("BPD Ex. 10"). The court also denied defendant's request for the court to reconsider its decision to deny testing on the actual knives. The court noted the parties had agreed to testing at an independent lab of hair samples and two blood samples from knife swabs (exhibits 47Q1 and 48Q1). The court reserved its ruling with regard to another sample taken from one of the knives (exhibit 18Q1). The court later ordered testing on exhibits 18Q1 and 18Q2 in January 2011.

¶ 37    Defendant appealed the trial court's decision. While the appeal was pending, on March 31, 2011, Orchid Cellmark's laboratory examination report was filed in the trial court. According to the results stated in the report, two stains (47Q1 and 48Q1) from a serrated knife with a bent blade were tested. DNA detected in one stain was consistent with the victim's, and DNA detected in the other sample was identified as the victim's. The hair found in the victim's hand was identified as originating from the victim in the absence of an identical twin. Other hair tested by the lab was determined to have either originated from the victim or was consistent with the victim's hair. Two other blood samples (18Q1 and 18Q2) from a knife were tested, and the DNA profile obtained was identified as originating from the victim.

¶ 38    In September 2011, this court reversed the trial court's denial of defendant's request to have the actual knives tested. *People v. Whalen*, 2011 IL App (4th) 090563-U, ¶ 28. According to this court's holding:

>    "Although the knives, after initial testing at the time of trial, had been stored for 15 years in an open box with other evidence and it is possible they were contaminated with the DNA of a person unrelated to the commission of the crime, it is also possible a third person could be identified who committed the crime. A 'mixed DNA sample' is accepted in the scientific community to reliably reveal the number of contributors to a DNA sample and major versus minor contributors. Further, testing may materially advance defendant's claim of innocence as defendant raised at trial, through an offer of proof, a specific named individual committed the murder and he was prevented from presenting testimony from an expert witness challenging the reliability of comparison evidence of defendant's palm print at the scene due to late disclosure of the expert." *Whalen*, 2011 IL App (4th) 090563-U, ¶ 1.

According to this court's decision, it was setting aside the understandable concern for efficiency and finality to allow the DNA tests then available to be conducted based on its review of the case and what had transpired since the murder. *Whalen*, 2011 IL App (4th) 090563-U, ¶ 34. This statement was made after this court earlier in the decision noted "[d]efendant acknowledges in his brief that his 'strongest case for exoneration or a new trial rests in the possibility that some or all of the evidence requested to be tested shows a third party committed or was involved in the murder.' " *Whalen*, 2011 IL App (4th) 090563-U, ¶ 27.

¶ 39    In August 2017, defendant filed a petition for relief from judgment and a new trial pursuant to section 2-1401 of the Civil Procedure Code (735 ILCS 5/2-1401 (West 2016)). According to the petition, "Nearly fourteen years after he first sought forensic testing and more than twenty-six years after his wrongful conviction, DNA testing has provided the answers that

Donald Whalen has always maintained it would: testing shows that he is innocent of his father's 1991 murder." The petition noted four knives left at the scene of the murder had been tested and defendant's DNA was not found. Instead, the victim's DNA was found and a mixture of the victim's DNA and another DNA profile was found. Defendant alleged the lack of defendant's DNA on the knives proved he did not kill his father.

¶ 40    One knife (exhibit 19A) contained a DNA profile of a mixture of at least two individuals on the blade. The victim could not be excluded as a possible contributor. Results from the knife handle were inconclusive. Another knife (exhibit 21A) had a partial DNA profile originating from at least one individual, and the victim could not be excluded as a possible contributor of the DNA. A third knife (exhibit 26A) had a DNA profile mixture of at least two individuals on the knife blade. Again, the victim could not be excluded as a contributor. Tests from the knife handle were inconclusive due to an insufficient amount of DNA. A fourth knife (exhibit 27A) had a DNA profile mixture of at least two individuals on the blade. Again, the victim could not be excluded. A DNA profile mixture of two individuals was detected on the knife handle. Once again, the victim could not be excluded. Defendant was excluded as the source of any DNA found on the knives.

¶ 41    Defendant's petition noted the trial court on July 13, 2015, ordered Dr. Karl Reich to perform an analysis of the Cellmark Forensics DNA results and attempt to deduce a combined DNA profile by analyzing the data from the DNA testing performed on the three knives (exhibits 19A, 26A, and 27A) where a combined DNA mixture of at least two people was found. On December 30, 2015, Dr. Reich issued a report detailing his analysis of the underlying data from the DNA testing. Dr. Reich believed combining DNA data from the three knives to determine a potential perpetrator was appropriate because the knives were related to the same incident, same victim, and likely were used by the same assailant. Dr. Reich created a summary of the data in an allele table. The Illinois State Police conducted a keyboard search for the combined profile generated from the DNA on the three knives. The keyboard search did not produce a hit.

¶ 42    Defendant also alleged in the petition Dierker's testimony regarding a link between defendant and the partial palm print found on the broken pool cue was suspect. Dierker testified the partial palm print could not have been made by anyone other than defendant. The petition noted the State, prior to trial, did not provide defendant with records related to a telephone conversation between Dierker and Bloomington police officers, which defendant argued significantly impacted the opinions testified to by Dierker at defendant's trial. According to the petition, the telephone logs revealed Dierker's opinion the palm print could not have been made by anyone other than defendant was demonstrably false. In the April 30, 1991, telephone log, Dierker noted the latent print was inconclusive as to the victim.

¶ 43    Defendant further requested leave to obtain discovery relating to the underlying opinions issued by Dierker so his own expert could perform an analysis of the prints at issue. If the discovery request was granted, defendant noted he would supplement his section 2-1401 petition with any new opinions related to the latent prints at issue.

¶ 44    Defendant also argued his exclusion as the source of DNA at the crime scene was bolstered by forensic testing done prior to trial, which showed defendant was not the source of blood on a number of items taken from the crime scene, including swabs and two bloody towels. Blood tests were performed on 36 items before defendant's trial, and defendant was excluded as a

source of the blood. Defendant's tennis shoes were also tested for blood, and none was detected.

¶ 45    Defendant contended he had presented evidence he is not guilty and two other individuals may be. Defendant noted no jury had ever been presented with any evidence implicating an alternate suspect in the murder, including Robert McElvaney.

¶ 46    In April 2018, defendant filed a supplement to his section 2-1401 petition, submitting a report from Michele Triplett, a latent print expert. Triplett noted a test was never performed to determine whether the latent palm print on the pool cue was in blood. As a result, defendant argued Dierker's trial testimony the latent print on the pool cue was left in blood was without any evidentiary or scientific basis. Triplett also opined no scientific means exists to determine when a latent print was deposited. As a result, she said the print could have been left on the pool cue before the murder.

¶ 47    In November 2018, the State filed an amended motion to dismiss defendant's section 2-1401 petition pursuant to both section 2-615 (735 ILCS 5/2-615 (West 2018)) and section 2-619 (735 ILCS 5/2-619 (West 2018)) of the Civil Procedure Code, which the trial court denied. A ground for dismissal argued by the State, which is pertinent to this appeal, was that the parts of defendant's petition relating to the latent print on the pool cue stick should be dismissed because defendant had discovered Dierker's telephone logs in 2007 but did not file his section 2-1401 petition until 2017. The State also argued Michele Triplett's potential testimony regarding the palm print evidence should not be considered and instead stricken from defendant's petition because it was untimely and also because of *res judicata* principles.

¶ 48    In late January 2019, the trial court held an evidentiary hearing on defendant's section 2-1401 petition. Colleen Whalen, the victim's wife and defendant's mother, testified her practice was to clean the knives at the tavern at the end of her shift and no one had any reason to use the knives after she left. She worked on April 5, 1991, until 5 p.m. She cleaned the knives per her usual practice at the end of her shift and would have thrown away any damaged knives, including bent knives. She testified defendant came into the tavern that day and "banged" around on the pool table.

¶ 49    McElvaney was called as a witness and invoked his fifth amendment right not to answer any questions.

¶ 50    McKinley, the crime scene investigator, was called as a witness and questioned about the palm print found on the broken pool cue. McKinley was shown an exhibit that he agreed was an outline prepared by the state's attorney's office for his potential trial testimony. McKinley agreed neither his crime-scene report nor his evidence receipts mentioned a latent print impression as described on page three of the trial-prep outline. McKinley also acknowledged neither his report nor his evidence receipts mentioned the "ridge detail" he described in his trial testimony. However, McKinley maintained he always testified truthfully and the ridge detail he saw on the pool cue stick was "vivid and very clear." On redirect, defense counsel established McKinley's observation was detailed enough for McKinley to form a belief on how the print was left on the cue stick. McKinley was asked what his trial testimony (see *infra* ¶ 9) meant when he stated the print was left in blood. McKinley answered his trial testimony meant "the hand, the finger, whatever—went onto the bloody pool cue." However, defense counsel further elicited McKinley's acknowledgment it would be left to the laboratory, not McKinley, to make that determination.

- 10 -

¶ 51        McKinley also acknowledged his own handwritten note on page three of the trial-prep outline. The handwritten note stated "go ahead and say it's blood," and the handwriting was immediately next to the outline's typed words "apparent blood stains on edge of door" and "stains on side of building east of door." When asked why he wrote this note, McKinley offered the following explanation: "It's very typical when I testify to say it's a red substance that appears to be blood, because I can't testify that it is blood. So when the State's Attorney says just go ahead and say it's blood, then that's what I wrote down ***."

¶ 52        Dierker testified he retired from his position at the Morton crime lab at the end of 2017. Defense counsel asked Dierker whether it would have been his practice in 1991 to document the need for more legible standards in his latent print worksheets if he compared latent prints to an alternate suspect and was not able to either identify or exclude the alternate suspect as the person who left the prints. Dierker answered, "Yes, if they were compared and my determination was that I needed additional prints in order to form a conclusion as to whether that print was made or not made by a certain individual, I would document that in my notes."

¶ 53        Defense counsel then asked Dierker about notes he wrote for telephone conversations that took place on April 22 and April 30, 1991. The April 22 phone call was 12 days after Dierker received the physical evidence in the case. The note for the April 22 phone call stated the call was to inform Detective McKinley of a "possible palmprint on exhibit 11." Dierker testified he was informing McKinley it appeared Dierker would need palm prints from the particular individuals the police wanted him to compare. Dierker testified he may have included the word "possible" in the note because he was not sure he had a print suitable for comparison. However, Dierker also stated:

        "I'm not sure that—it might be a poor choice of words on my part, but it could have been I suppose a situation where I wasn't sure if it was a finger or a palm, and that it would more than likely be a palmprint if I said possible, and that I was just informing them that in order to make any determination I would need palmprints of the particular people. So it might have been just a situation where because many times they don't submit palmprints without basically being requested to or knowing that there's a possibility that we might have a latent impression that is a palm, that many times it's a courtesy of the agency that we say could you please submit palmprints also so that we have everything that we need to examine the case."

Dierker had no independent memory why he wrote the word "possible."

¶ 54        Dierker testified he finished processing the palm print on the pool cue on April 17, 1991, which was before his April 22, 1991, phone call with Detective McKinley. Defense counsel and Dierker then had the following exchange regarding why Dierker would say he had a "possible" palm print after he had finished processing the print:

        "[DEFENSE COUNSEL]: So by April 22nd, 1991, even after fully processing the latent print on exhibit 11 you still only considered it to be a possible print, correct?

        [DIERKER]: Well, when I'm processing a large case many times I will be processing a large number of items at a time and I'm attempting to find latent prints on many different items at a time. We can photograph an item and then set the photograph aside until we have time to sit down and actually do an evaluation and determine if we feel the latent print is suitable for comparison. A case that's large many times I would be examining multiple items and attempting to process all of those during a period of time as well."

Dierker later testified "the process of determining whether the print is suitable for comparison is usually done after my processing is completed."

¶ 55    Defense counsel then questioned Dierker about his note regarding his April 30, 1991, telephone call with Detective McKinley where he informed the detective the palm print on the pool cue was inconclusive to the victim. Even though Dierker had compared the victim's print with the latent print found on the pool cue and could neither identify nor exclude the victim as the source of the print, Dierker made no mention of this in his report.

¶ 56    According to Dierker's testimony, he did not compare the print to any other standards or get a different sample from the police for the victim to compare to the palm print after he determined the latent print belonged to defendant. Dierker testified it is a practical impossibility for the print to belong to someone other than defendant after it was identified as defendant's print.

¶ 57    Dierker testified he knew defendant was a suspect in the crime when he matched defendant's palm print to the latent palm print on the pool cue. Detective McKinley provided Dierker with defendant's standards on May 30, 1991. Dierker identified defendant as the source of the palm print the same day. On June 10, 1991, an assistant state's attorney told Dierker she did not think it was necessary for him to compare any other elimination prints, other than defendant's and the victim's, to latent prints found at the scene.

¶ 58    Dierker acknowledged the reddish-brown substance the latent palm print was left in was never tested to determine if it was blood. He concluded the substance was blood based on what he learned from the serologist. A reddish-brown substance on another part of the pool cue did test positive for blood. Dierker did not know where the substance tested was located on the cue. Dierker also conceded he knew of no peer-reviewed study to support his assertion at trial a latent print already on the pool cue would repel blood coming in contact with the print.

¶ 59    Michele Triplett, an expert in the field of latent fingerprint processing, analysis, and examination, testified the reddish-brown substance at the latent palm print was never tested to determine if it was blood. Further, serology testing could not be done on the latent print now because amido black had been used on the latent print and contaminated the area. She testified if the substance was not the victim's blood, it was possible the palm print could have been on the pool cue prior to the victim's murder. According to her testimony on direct examination, she could not tell from the photographs she was provided whether the palm print was a "put-down" or "take-away" print.

¶ 60    On cross-examination, the State challenged her testimony that she could not tell whether the palm print was a "put-down" or "take-away" print in the following exchange:

> "[THE STATE]: Can you tell looking at the photos now if it was a put-down or a take-away print?
>
> [TRIPLETT]: Well, the ridges are dark, but ridges on a fingerprint are a raised portion, so when you touch something there's pressure that goes down. So it's not just light or dark. They call them tonal reversals, so there are shifts. Primarily you can follow or I can follow the dark ridges to make an identification, but without seeing color pictures it would be—it leads me to believe that they were put-down prints. The dark ridges are an indication of put-down prints. Can I tell that for sure? Not from the black and white photo.

\* \* \*

[THE STATE]: I'm sorry. Earlier today when you were testifying, I just want to make sure that I'm understanding you correctly, did you tell us that you could not tell if this was a put-down or a take-away? Earlier today did you say that to the Court?

[TRIPLETT]: I cannot tell for sure, yes. What I can say is there's support for it's more likely that it's probably a put-down print because of the dark ridges, but I can't tell for sure."

¶ 61 On further cross-examination, Triplett confirmed the digital copies of the latent palm print recovered from the pool cue were suitable for comparison purposes:

"[TRIPLETT]: I received digital copies that were said to be of comparison value and that they came from the Illinois State lab, so I believe that they were. Yes, they were in black and white.

[THE STATE]: So they were of a high enough quality that you could have conducted the comparison between the latent prints and Donald Whalen's standards if defense counsel had asked you to do that; is that right?

[TRIPLETT]: Yes."

Triplett also further stated defendant could not be excluded as the source of the palm print in the following exchange:

"[THE STATE]: Can you tell for sure whether the latent print matches [defendant's]? Can you tell us whether that latent prints excludes [defendant]?

[TRIPLETT]: Those are two separate questions. Which one?

[THE STATE]: Can you tell for sure whether the latent prints excludes [defendant]?

[TRIPLETT]: No."

¶ 62 On re-direct examination, Triplett testified Dierker's testimony the latent palm print was in blood had no scientific foundation or evidentiary support. However, neither her testimony regarding the suitability of the palm print for comparison value nor her opinion defendant could not be excluded as the source of the latent print were challenged by defense counsel.

¶ 63 Dr. Reich testified the knives were not preserved in an ideal way before he examined them in 2005. According to his testimony, the way the knives were stored did not "negate the ability to sample and test them." However, he noted "[i]t might influence the interpretation of the data." Dr. Reich stated the knives had been examined for latent prints and were also swabbed by the laboratory to collect biological evidence in 1991. Although he had no personal knowledge, he believed the knives had been handled in some way during defendant's trial based on the way they ended up in the storage box. According to Dr. Reich, given the way the victim died and the murder scene, Reich would have expected to see the DNA of the victim and the attackers at the scene.

¶ 64 The knives and the swabs taken from the knives were forensically tested. During Dr. Reich's testimony, the court admitted defendant's exhibits 69, 70, and 71. Exhibits 69 and 70 were laboratory examination reports from Orchid Cellmark dated January 30, 2010, and February 28, 2011, respectively. These reports showed all the DNA obtained from the items tested was consistent with the victim. Exhibit 71 was a laboratory examination report from Cellmark Forensics dated November 29, 2013. It was prepared as a result of this court's order allowing the knives to be tested. Only after the knives were tested did the mixed DNA profiles appear.

¶ 65    Dr. Reich testified he expected to find the assailant's DNA on the knives used to attack the victim in this case given the nature of the attack, noting an assailant using a knife without a blade guard is very likely to cut himself. Defendant's DNA was not found on the knives, but the victim's DNA was. Some other unidentified DNA was found on the knives, but the amount of this DNA was not sufficient to identify anyone other than the victim. Dr. Reich conceded one explanation for the unidentified DNA was contamination. When asked to explain what contamination means in the DNA testing context, Dr. Reich stated:

"The simplest explanation is that contaminating DNA is DNA that makes its way on the item of evidence and then is identified by genetic profiling as not coming from a probative source. So it could be DNA that's irrelevant to the sample but was deposited there by first responders, by the ambulance, by the scene technician, by the analyst, by anybody else who is not really associated with the item or the event. Contamination is a fact of life in forensic DNA laboratories."

Dr. Reich testified he was confounded by the lack of DNA evidence at the scene of this murder.

¶ 66    Jennie Hahn, a retired forensic scientist in the area of biology at the Morton crime lab, testified she worked on the investigation of William Whalen's death in 1991. She removed part of a reddish-brown stained area on the pool cue with a Q-tip from an area where Dierker directed her to avoid compromising the site of a latent print. She identified the substance she tested as human blood. She did not know how far the latent print was from the stain she sampled. She could not give any scientific testimony as to what other substances might have been on the pool cue.

¶ 67    On February 13, 2019, the trial court issued its ruling on defendant's section 2-1401 petition. The court noted the State did not have any eyewitness testimony. Further, defendant did not make a confession or any statements against his interests. According to the court, the State's case was based almost entirely on circumstantial evidence and centered around the blood and print evidence.

¶ 68    The trial court noted the State argued defendant's motive for murdering his father was to fund his drug habit but noted the evidence to support this claim was entirely circumstantial. In addition, the court stated the person who killed decedent left a large amount of money at the crime scene.

¶ 69    While noting no new evidence was presented about the shoe print found at the crime scene, the court stated evidence at the trial indicated defendant had a pair of Converse shoes when he was arrested approximately two months after the murder. Defendant's shoes were the same length and width as the shoe that left the print at the murder scene. However, the court noted the wear pattern on defendant's shoes, on which no blood was detected, could not be matched to the shoeprint at the murder scene. The court also stated the type of shoe and size of shoe was not uncommon for the time when the murder occurred.

¶ 70    The trial court indicated it could not consider McElvaney's testimony in the context of the section 2-1401 hearing, as it was not newly discovered evidence.

¶ 71    With regard to the DNA evidence, the trial court noted five or six knives were found at the crime scene. The court noted three of the knife blades contained a total of four different combined blood mixtures that could include the victim but would exclude defendant. The court stated defendant had been excluded from every sample of blood provided. The court found the lack of defendant's DNA on any of the knives, as well as other items examined, constituted

new and relevant evidence. The court also stated the DNA evidence potentially implicated an unknown assailant. However, the court also recognized Dr. Reich's testimony the unknown DNA could have resulted from contamination. Regardless, according to the trial court, this DNA evidence would have changed the way defendant's jury considered the evidence at defendant's trial.

¶ 72    As to the palm print on the cue stick, the trial court discussed Dierker's telephone logs, particularly the two logs from April 22 and April 30, 1991. The April 22, 1991, telephone log indicated Dierker said there was a possible palm print on the pool cue. The April 30, 1991, telephone log noted Dierker said the palm print was inconclusive as to the victim. The court noted the telephone logs were never made available or provided to the defense and constituted new evidence. According to the court, if the palm print was not suitable to compare to the victim, Dierker's opinion the palm print matched defendant's profile was called into question.

¶ 73    In addition to the telephone logs, the trial court found defendant introduced new evidence challenging the scientific basis for Dierker's expert testimony and the State's argument the palm print was in the victim's blood because the substance the palm print was in was never tested to verify it was blood. A visual examination of the reddish-brown substance on the pool cue was not sufficient to scientifically establish the substance was blood. However, the court noted a trier of fact could draw an inference the substance was blood.

¶ 74    The trial court also commented on the summary or outline provided to McKinley by the assistant state's attorney to prepare McKinley to testify at defendant's trial, which was not available to defendant at his trial. The court noted the summary commented on how the palm print was placed on the cue stick as a "take away" print, even though McKinley never wrote any kind of report providing a basis for his trial opinion. While noting McKinley testified he never tailored his testimony to anything but the truth, the court found the summary was relevant as to the weight McKinley's testimony should have been given.

¶ 75    In conclusion, the trial court stated:

"So, there is new evidence and the court hereby finds that after taking all of the evidence at the trial, together with the newly discovered DNA evidence, the additional notes from John Dierker indicating that the palm print found on the pool cue stick was inconclusive as to the victim, that both blood and fingerprint evidence were significant factors at the defendant's trial based on the state's theory presented that the defendant was the sole assailant who stabbed the decedent over 30 times and struck the [decedent] with a pool cue and a bar stool several times, and that the palm print on the pool cue could only be the defendant's and only have been deposited during the commission of the crime, that this evidence was more likely than not to have affected the jury's determination, and the court further finds the likelihood of a different result is great enough to undermine the confidence in the outcome of the original trial. As a result, the Petitioner's 2-1401 petition is allowed, his convictions are hereby vacated, and a new trial is ordered."

¶ 76    This appeal followed.

¶ 77                                    II. ANALYSIS

¶ 78        In *People v. Coleman*, 2013 IL 113307, ¶ 96, 996 N.E.2d 617, our supreme court stated:

> "Substantively, in order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. [*People v. Washington*, 171 Ill. 2d 475, 489, 665 N.E.2d 1330 (1996)]. New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result."

The trial court in this case allowed defendant's petition pursuant to section 2-1401 of the Civil Procedure Code (735 ILCS 5/2-1401 (West 2018)), finding the new evidence presented by defendant "was more likely than not to have affected the jury's determination, and the court further [found] the likelihood of a different result [was] great enough to undermine the confidence in the outcome of the original trial."

¶ 79        On appeal, the State argues the claims related to the latent palm print on the pool cue stick were time-barred and should not have been considered. Further, the State argues the trial court's decision granting defendant's petition for relief from judgment pursuant to section 2-1401 of the Civil Procedure Code (735 ILCS 5/2-1401 (West 2018)) was manifestly erroneous and should be reversed outright. In the alternative, the State contends the trial court relied on this court's decision in *Davis*, 2012 IL App (4th) 110305, ¶ 63, where, according to the State, this court erred in equating "the phrase 'probably change the result' to a 'reasonable probability' that is merely enough to undermine confidence and need not be 'more likely than not.' " Thus, if an outright reversal is not justified, the State argues we should reverse the trial court's decision to grant defendant's section 2-1401 petition and remand this case and order the trial court to reconsider its decision under the proper standard.

¶ 80                                  A. Palm Print Claim

¶ 81        We first address the State's argument the trial court should have dismissed defendant's claim related to the latent palm print on the pool cue stick because defendant did not make the claim within two years of defendant receiving Dierker's telephone logs. Even assuming, *arguendo*, the State is correct a claim based on Dierker's telephone logs would not have been timely on its own, the State agrees defendant could proceed with his section 2-1401 petition pursuant to section 116-3 of the Criminal Procedure Code (725 ILCS 5/116-3 (West 2018)) because of the new DNA evidence in this case. Moreover, in its reply brief and at oral arguments, the State further posited the telephone log evidence would be admissible in the present section 2-1401 litigation even if defendant had based a prior section 2-1401 petition on this same evidence.

¶ 82        Section 116-3 allows a defendant, in some situations, to have forensic DNA testing performed on evidence secured in relation to a trial or guilty plea that resulted in the defendant's conviction. 725 ILCS 5/116-3 (West 2018). Section 2-1401(c) of the Civil Procedure Code states:

"Except as provided in Section 20b of the Adoption Act [(750 ILCS 50/20b (West 2018))] and Section 2-32 of the Juvenile Court Act of 1987 [(705 ILCS 405/2-32 (West 2018))] or in a petition based upon Section 116-3 of the Code of Criminal Procedure of 1963, the petition must be filed not later than 2 years after the entry of the order or judgment. Time during which the person seeking relief is under legal disability or duress or the ground for relief is fraudulently concealed shall be excluded in computing the period of 2 years." 735 ILCS 5/2-1401(c) (West 2018).

The results of the DNA tests performed on the knives in this case are the primary bases for defendant's section 2-1401 petition as written.

¶ 83    In the case *sub judice*, defendant received Dierker's telephone logs approximately 15 years after his trial, and he sought to present the log evidence along with the DNA evidence. Pursuant to *Coleman*, we find Dierker's telephone logs were "new" evidence, and given the unique circumstances of this case, we are not persuaded the trial court erred in considering the telephone log evidence simply because a section 2-1401 claim based only on the telephone logs might have been untimely.

¶ 84                    B. Trial Court's Order Granting Defendant's Section 2-1401 Petition

¶ 85    We next address the State's arguments (1) the trial court erred by granting defendant's section 2-1401 petition for relief from judgment and (2) this court erred by equating the phrase "probably change the result" of a new trial with a "reasonable probability" the result of a new trial would be different. The State asks this court to reverse the trial court's decision outright or reverse the trial court's decision and remand the case for the trial court to determine whether it is more likely than not a new trial would lead to a different result.

¶ 86    In announcing its decision to vacate defendant's conviction and order a new trial, the trial court found the "new" DNA evidence would likely change how a jury in a new trial would consider the evidence at defendant's original trial. However, we note this is not a case where defendant was convicted based on biological evidence left by him at the crime scene. In fact, at defendant's trial, evidence was presented excluding defendant as the source of any blood found at the crime scene.

¶ 87    As a result, the situation in this case is distinguishable from what occurred in *Davis*. In *Davis*, the State spent considerable time explaining how the serological evidence available at the time of trial included the defendant as someone who could have committed the crime. *Davis*, 2012 IL App (4th) 110305, ¶ 53. However, the newly discovered DNA evidence in *Davis* excluded the defendant as the donor of the blood and semen left on bedding where the victim's rape and murder had occurred.

¶ 88    Here, contrary to defendant's assertion in his section 2-1401 petition, the fact defendant's DNA evidence was not found at the murder scene, on its own, does not establish he did not commit the crime. Dr. Reich noted in the October 2005 supplement to his original report to the court that DNA results from samples only containing the victim's DNA would provide little scientific evidence of use for the defense. As noted, defendant was found guilty without any biological evidence tying him to the murder.

¶ 89    Since defendant's trial, no one other than the victim has been identified as a source of DNA found at the crime scene. In late 2006 and early 2007, the Morton crime lab tested many items of evidence in this case for DNA evidence, including (1) boxes in which blood swabs from the

crime scene had been stored in, (2) swabs from the crime scene containing blood, and (3) bloodstains, indicated bloodstains, and stain samples from (a) knives, (b) a piece of broken pool cue, (c) the door to the tavern, and (d) a bar stool. As to the DNA found, the victim could not be excluded as the source with two exceptions. The Morton crime lab did find a DNA profile on a cigarette butt attributable to neither defendant nor the victim. However, the trial court did not order the cigarette butt retested because it was found in a public bar and did not advance defendant's innocence claim. The crime lab also detected a mixed profile on a filet knife (exhibit 18). One of the DNA profiles matched the victim. An additional DNA type was found at one locus. However, it appears when a blood sample from the filet knife was later tested, only the victim's DNA was identified.

¶ 90    According to Cellmark Forensic's supplemental report dated November 29, 2013, all of the DNA Orchid Cellmark found on the items it examined in 2009 and 2010 was either identified as originating from the victim (in the absence of an identical twin) or was consistent with the victim. The items tested included blood stains from a serrated knife with a bent blade, hair found in the victim's right hand, other hair found at the crime scene, and two blood samples from a knife. Cellmark Forensics only identified a mixed DNA profile, including the DNA of someone other than defendant and the victim, on the knives which this court ordered tested even though they had been stored together unsealed for 15 years and were possibly contaminated with the DNA of persons unconnected with the murder. No one was identified from the DNA not associated with the victim.

¶ 91    Dr. Reich did note in his October 2005 supplement to his original report that a mixed profile of the DNA of the victim and an unknown third party would provide strong scientific evidence for the defense. However, Dr. Reich also conceded contamination could explain the DNA found on the knives that was not associated with the victim.

¶ 92    Dr. Reich was confounded by the lack of DNA evidence found at the murder scene. According to Dr. Reich, he would expect to find DNA from the assailant on the knives used in a brutal knife attack like the one at issue in this case. Further, he testified it was very unlikely defendant handled any of the items tested in the violent assault on decedent because defendant was excluded as being a source of DNA on the items. However, the DNA left at the scene did not identify anyone other than the victim, and the victim clearly did not kill himself. As a result, regardless of Dr. Reich's testimony, whoever murdered the victim in this case may have done so without leaving behind any DNA evidence. The situation would be much different if the DNA test results showed DNA found on the murder weapons originated from McElvaney or some other individual who could be linked to the murder.

¶ 93    Even though defendant did not present any new evidence regarding the shoeprint left in blood at the crime scene, the trial court commented on the trial evidence, stating:

"We know that the defendant had shoes at the time of his arrest that were of the same length and width as the shoe prints that were left at the murder scene. We know that the defendant's shoes could not be matched to the shoes that left the impressions at the murder scene. We know that the defendant's shoes that were retrieved from him at the time of this arrest had no blood on them."

The trial court pointed out the type and size of the shoe that made the shoeprint was not uncommon for the time when the murder occurred. While true, we also note defendant told police officers he had recently thrown away a pair of the same model of Converse shoes prior to his arrest.

- 18 -

¶ 94    As previously stated, the trial court commented on the summary or outline the assistant state's attorney provided to McKinley so he could prepare for his testimony. *Supra* ¶ 74. Here, we note McKinley never opined at trial whether the latent print was a "put-down" or "take-away," and he was never asked for his opinion on that issue. Moreover, the summary or trial-prep outline did not make any reference to the latent prints as "take-away" or "put-down."

¶ 95    The trial court correctly recognized the importance the State placed on the evidence regarding the "bloody" palm print at defendant's trial. The court noted the State argued the evidence indicated defendant's bloody palm print was not on the pool cue stick prior to the attack on the victim. In announcing its decision to vacate defendant's conviction and order a new trial, the trial court stated the following:

> "If the palm print secured from Exhibit 11, the pool cue, was unsuitable for comparison to the victim, William Whalen, then the court finds that that [*sic*] casts doubt on the opinion that the palm print was a match to the defendant; in the alternative, if the palm print was unsuitable for comparison to the victim, then that casts doubt on whether the print could not have been made by anyone except the defendant as it could have been the victim's if, as testified to by Mr. Dierker, a better print was available or a better print standard for comparison purposes was available."

¶ 96    However, Michele Triplett, defendant's expert witness, testified she had compared defendant's print to the palm print on the pool cue. Triplett was never asked by defense counsel whether defendant's palm print did not match the print on the cue either on direct or redirect examination. Further, Triplett's testimony corroborated Dierker's that the print on the pool cue was suitable for comparison. Additionally, Triplett testified the palm print appeared to be a "put-down" print, although she could not say for certain. Finally, it does not appear defendant presented any new evidence this was not defendant's palm print on the pool cue.

¶ 97    The trial court correctly noted the substance on the pool cue in which the palm print was left was never scientifically determined to be blood. While accurate, this is not new evidence. The State's 1991 trial evidence was quite specific the substance in which the palm print was found was *not* scientifically tested. In fact, the State emphasized it did not test the substance to avoid compromising the latent print.

¶ 98    At defendant's trial, the State told the jury "the evidence indicates to you that the manner in which that print was on there was in such a way that it only got there when it was used to kill Bill Whalen. That print *** was not on there at any time prior to Bill Whalen being killed ***." Defendant argues the State's failure to scientifically establish the print was left in blood would allow a jury in a new trial to conclude the print was left on the cue stick in some unknown substance at some unknown time prior to the murder. Hence, without scientific testing to prove the substance was blood, the State would need to rely on the jury drawing an inference the substance was the victim's blood. In response, the State argues the totality of the evidence "overwhelmingly" supports such an inference.

¶ 99    Here, we note defendant at trial never raised any question or concern about the absence of testing during cross-examination of Dierker or Hahn, nor in closing argument. Defendant, like the State, appeared to accept the inference the reddish-brown substance was blood. A similarly colored substance was tested from a different part of the pool cue stick with the latent print and was found to be blood. Similarly colored substances were also tested on other pieces of the broken cue sticks and were indicated to be blood. Defendant's strategy was never to challenge

whether the substance containing the print was blood until defendant submitted Triplett's report approximately 27 years after the murder.

¶ 100    In rendering its judgment, the trial court noted the evidence was "more likely than not to have affected the jury's determination," and it found "the likelihood of a different result is great enough to undermine the confidence in the outcome of the original trial." It is apparent the court, understandably and justifiably, applied the "reasonable probability" standard this court set out in *Davis*, 2012 IL App (4th) 110305, ¶¶ 62-63, where we stated:

> "New evidence need not be completely dispositive of an issue to be likely to change the result upon retrial. It need only be *conclusive* enough to *probably* change the result upon retrial. [Citation.]
>
> It is important to clarify what is meant by the phrase 'probably change the result' upon retrial. In the context of a *Brady* violation (*Brady v. Maryland*, 373 U.S. 83 (1963)), the Supreme Court of the United States recently explained, 'A reasonable probability does not mean that the defendant "would more likely than not have received a different verdict with the evidence," only that the likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the trial." ' [Citation.] The phrase is also explained or clarified in the same way in *Strickland v. Washington*, 466 U.S. 668, 694 (1984), in the context of an ineffective assistance of counsel claim." (Emphases in original.)

Even though the author in the instant case concurred in the *Davis* opinion, we now conclude this court erred by equating the language "probably change the result on retrial" with a "reasonable probability" the result would change on retrial. Notably, the former standard places a higher burden on a defendant than does the latter.

¶ 101    The rationale for the standard applied by the United States Supreme Court in *Brady* and *Strickland*, which this court relied on in *Davis*, does not apply to a defendant's request for a new trial based on newly discovered evidence.   According to the Supreme Court, a defendant claiming ineffective assistance of counsel did not need to show his attorney's deficient representation "more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. The Court then explained:

> "This outcome-determinative standard has several strengths. It defines the relevant inquiry in a way familiar to courts, though the inquiry, as is inevitable, is anything but precise. The standard also reflects the profound importance of finality in criminal proceedings. Moreover, it comports with the widely used standard for assessing motions for new trial based on newly discovered evidence. [Citation.] Nevertheless, the standard is not quite appropriate.
>
> Even when the specified attorney error results in the omission of certain evidence, the newly discovered evidence standard is not an apt source from which to draw a prejudice standard for ineffectiveness claims. The high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged. [Citation.] An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself

unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland*, 466 U.S. at 693-94.

This language from *Strickland* instructs a "more likely than not" standard should be applied in cases like this one.

¶ 102 Our supreme court in *Coleman* did cite *Davis* with approval. However, the supreme court did not specifically adopt this court's definition for the language "probably change the result." In fact, the supreme court indicated the actual innocence standard is extraordinarily difficult to meet. *Coleman*, 2013 IL 113307, ¶ 94. In addition, the supreme court cited *People v. Edwards*, 2012 IL 111711, 969 N.E.2d 829. In *Edwards*, the supreme court equated the phrase "probably change the result" with "it is more likely than not that no reasonable juror would have convicted" the defendant. (Internal quotation marks omitted.) *Edwards*, 2012 IL 111711, ¶ 40. Subsequent to *Davis*, this court in *People v. Merriweather*, 2017 IL App (4th) 150407, ¶ 25, 80 N.E.3d 127, cited *Edwards* for the proposition relief on an actual innocence claim should be granted only when it is more likely than not no reasonable juror would have convicted the defendant in light of newly discovered evidence. Finally, our supreme court in *People v. Sanders*, 2016 IL 118123, ¶¶ 24, 47, 47 N.E.3d 237, cited *Edwards* for this same proposition.

¶ 103 Based on the record in this case, it is unclear whether the trial court would have vacated defendant's conviction and ordered a new trial if the court had not followed the "reasonable probability" standard erroneously put forward by this court in *Davis*. As a result, we reverse the trial court's order vacating defendant's conviction and direct the trial court to determine whether it is "probable" or "more likely than not" a jury would acquit defendant after a new trial where the new evidence in this case is considered alongside the original trial evidence.

¶ 104                                III. CONCLUSION

¶ 105 For the reasons stated, we reverse the trial court's order granting defendant's section 2-1401 petition and vacating defendant's conviction. We remand for further proceedings so the court can determine whether a different result after a new trial would be "probable" or "more likely than not" based on the new evidence in this case considered alongside the original trial evidence.

¶ 106 Reversed and remanded.